SUPREME COURT OF ARIZONA
En Banc

| | | |
|---|---|---|
| STATE OF ARIZONA, | ) | Arizona Supreme Court |
| | ) | No. CR-03-0083-AP |
| Appellee, | ) | |
| | ) | Maricopa County |
| v. | ) | Superior Court |
| | ) | No. CR2001-095438 |
| ROBERT LOUIS CROMWELL, | ) | |
| | ) | |
| Appellant. | ) | **O P I N I O N** |
| | ) | |
| _____ | ) | |

Appeal from the Superior Court of Maricopa County
No. CR2001-095438
Honorable Mark F. Aceto, Judge
**AFFIRMED**

_____

TERRY GODDARD, ARIZONA ATTORNEY GENERAL                    Phoenix
     By    Kent E. Cattani, Chief Counsel,
           Capital Litigation Section
           James P. Beene, Assistant Attorney General
Attorneys for the State of Arizona

SUSAN M. SHERWIN, MARICOPA COUNTY LEGAL ADVOCATE          Phoenix
     By    James L. Logan, Deputy Legal Advocate
           Consuelo M. Ohanesian, Deputy Legal Advocate
Attorneys for Robert Louis Cromwell

_____

**J O N E S,** Justice (retired)

¶1      On February 19, 2003, a Maricopa County jury convicted

Robert Louis Cromwell of one count of first degree murder and

one count of sexual assault in the October 8, 2001 death of eleven-year-old Stephanie Shortt. The jury also convicted Cromwell of two counts of aggravated assault, one against Ella Speaks, Stephanie's mother, and the other against Ella's friend, Kim Jensen. On March 6, 2003, Cromwell was sentenced to death for the murder, to life imprisonment without the possibility of release for thirty-five years for the sexual assault, and to ten years' imprisonment each for the two aggravated assault charges.

¶2    On March 14, 2003, notice of appeal was filed in this court under Rules 26.15 and 31.2(b), Arizona Rules of Criminal Procedure, and Arizona Revised Statutes ("A.R.S.") § 13-4031 (2001). This court has jurisdiction pursuant to Article 6, Section 5.3, of the Arizona Constitution and A.R.S. § 13-4031.

## FACTS[1] AND PROCEDURAL HISTORY

¶3    Stephanie Shortt lived with her mother, Ella Speaks, and two younger sisters, Amanda and Heather, in a one-bedroom apartment located on Flower Street, near the intersection of 32nd Street and Osborn Road in Phoenix. Ella met the defendant, Robert Cromwell, in the early evening hours of October 7, 2001 while walking from her apartment to a nearby convenience store

---

[1]    We view the facts in a light most favorable to sustaining the jury's verdict. *State v. Tucker*, 205 Ariz. 157, 160 n.1, 68 P.3d 110, 113 n.1 (2003); *State v. Gallegos*, 178 Ariz. 1, 9, 870 P.2d 1097, 1105 (1994).

2

to purchase transmission fluid for her car. Ella passed a building where she saw Cromwell sitting on a bench. Cromwell yelled out to her, "Hey, are you a prostitute or a police officer?" Ella continued walking and replied, "I'm neither one. I'm a mother and I'm having a bad day. Leave me alone." Cromwell then got on his bike and rode toward Ella. Upon reaching her, he said, "I just want to apologize to you. That was a very rude thing I said. In this area, there's a lot of prostitutes. I can't believe that I disrespected you that way and I want to give you my fullest apology." Ella told Cromwell, "It's okay. I'm just having a bad day. I don't mean to lash out at you, but I'm not in the mood for those kind of comments." Cromwell then told Ella he would escort her to the store because "this is a bad area and it's now dark at this time." Ella saw some men off to her left and was "almost relieved" that Cromwell was going to walk with her to the store.

¶4     Ella went into the store alone where she purchased transmission fluid. When she emerged, Ella found Cromwell waiting for her. The two walked back to her apartment and according to Ella's testimony, Cromwell seemed "kind" and "caring."

¶5     At the apartment, Cromwell helped Ella put the transmission fluid into the automobile. Ella then asked

Cromwell if he would like to accompany her and her three daughters to a nearby fast-food restaurant. Cromwell agreed to go, but wanted first to take the bicycle back to his apartment. Ella and the children followed Cromwell and parked the car to wait for him outside the apartment. Cromwell parked his bike, changed his clothes, then drove with Ella and her three girls to the restaurant.

¶6      On the way, Cromwell and the children sang songs. At the drive-through window, Ella offered to buy Cromwell a hamburger. He declined. They obtained food for Ella and the children and went back to Ella's apartment. While the children ate, Ella and Cromwell went into her bedroom where the two talked and Ella smoked methamphetamine. After spending about an hour in the bedroom, Cromwell agreed to accompany Ella to a number of local bars where she filled out job applications and played a few games of pool.

¶7      Cromwell had one drink during the bar visits, and Ella had none. At one bar location, Cromwell leaned over a pool table and tried to kiss Ella on the mouth, but she turned her cheek. Cromwell said, "I can tell you didn't like it, but I will do it again." Ella replied, "I don't think you will," at which time Ella noticed that Cromwell smiled as if he understood, and he apologized once again.

4

¶8    When Ella and Cromwell returned to her apartment around 1:00 a.m., the children were on a mattress in the living room, still awake. Ella told the girls to go to sleep, and Ella and Cromwell went into the bedroom where they played cards for about an hour.

¶9    At some point, with Cromwell still in the apartment, Ella received a phone call from a friend, Kelly Lancaster, asking that she come to his house to help resolve a disturbance being caused by a mutual acquaintance, Kim Jensen. Ella agreed and determined to leave her children with Cromwell because "he seemed so nice." Cromwell told Ella he would just stay in her room while she was gone. Ella was gone from the house for a little more than an hour.

¶10   During Ella's absence, Stephanie's nine-year-old sister Amanda was awakened by the sound of Stephanie making a noise as if "she was really hurt." Amanda then saw Stephanie standing in the bathtub, unclothed, while Cromwell, with socks on both of his hands, washed her with soap. Amanda got out of bed on several occasions while Ella was gone, but Cromwell angrily told her to get back to bed each time. Eventually, Amanda saw Stephanie follow Cromwell into Ella's bedroom. Although Stephanie remained in Ella's bedroom, Amanda saw Cromwell move from the bedroom to the kitchen several times.

During one such trip, Amanda heard a noise like "silverware shatter," and while Cromwell and Stephanie were in the bedroom, she heard noises that made her think Stephanie was hurt. She then heard a "big bang" that sounded like a television dropping to the floor. Amanda finally fell asleep while Stephanie was in the bedroom with Cromwell.

¶11 When Ella returned to the apartment, accompanied by Kim Jensen, Cromwell attacked both of them with a pool cue, resulting in injuries to each. Cromwell ran out of the apartment after the attack and Ella quickly followed, after looking unsuccessfully for Stephanie.

¶12 Cromwell's attack on Ella and Kim awakened Amanda. She saw her mother chase Cromwell out of the apartment. Kim Jensen was lying on the floor with a head injury. Amanda and Heather, the youngest sister, then got up and went to the bedroom to look for Stephanie. Amanda reached into the bed, felt Stephanie's legs and saw that the television set was resting on Stephanie's head. She and Heather removed it, then ran downstairs and asked the landlord to call 9-1-1, which he did. After the call, Amanda and Heather went back upstairs and into the bedroom. They observed blood stains on the bedding and found Stephanie's body, bruised and bloody.

¶13    Police Officer Tallon Busby responded to the 9-1-1 call. When he arrived, the door was open and Kim Jensen was on the floor. Officer Busby described the scene: "Laying [sic] inside the doorway was a white female. From the waist down she was outside the apartment, from the waist up, she was laying [sic] facedown in the apartment. There was a blood smear on the door." He asked Kim, who was semi-conscious, if anyone else was in the apartment. She replied that the baby was in the bedroom. He then asked Kim where she was injured, and she replied that she had been hit on the back of the head. Officer Busby observed that the hair on the back left side of Kim's head was "matted in blood."

¶14    The officer then went into the dark apartment and observed a light in the bedroom. He walked toward the doorway and saw Stephanie lying face up on the bed. A blanket covered her unclothed body from the waist down. She had "visible wounds on her face and blood coming out of her nose and lips and out of her mouth." There was a "huge pool of blood" under her head and shoulders. Officer Busby checked to see if Stephanie was breathing and if she had a pulse. He felt a "slight pulse" at her neck. He placed his hand on Stephanie's chest and "felt a slight rise and fall." Visible evidence of severe vaginal trauma indicated that Stephanie also had been sexually abused.

7

¶15      By the time Gary Ford, a Phoenix Fire Department paramedic, arrived, Stephanie no longer had a pulse and had stopped breathing. While performing cardiac pulmonary resuscitation, Ford observed that Stephanie had suffered a head wound and multiple stab wounds to her back. Ford also observed the vaginal injuries. After attempting CPR and other life-saving procedures, the paramedics rushed Stephanie to Good Samaritan Hospital.

¶16      Dr. Wendy Lucid was on duty at the Good Samaritan emergency room when Stephanie arrived. Stephanie had no heartbeat and was not breathing. Initially, Dr. Lucid did a full body assessment. She found a large laceration on Stephanie's forehead. Closer inspection revealed a skull fracture. Due to the severity of Stephanie's head injuries, Dr. Lucid stopped all life support efforts and pronounced her dead. Dr. Lucid then turned Stephanie onto her side and observed eleven stab wounds on her back. Further examination also revealed the vaginal injuries.

¶17      The medical examiner performed an autopsy on Stephanie's body. Based on the injuries, he determined Stephanie had received a minimum of five blows to the head and thirteen stab wounds to the back. The stabbing punctured her right lung, causing it to collapse. In the opinion of the

examiner, Stephanie was alive at the time she suffered the vaginal trauma and at the time she was stabbed. The cause of death was multiple blunt force and stabbing injuries inflicted on her head and back.

¶18    The grand jury indicted Cromwell October 16, 2001 on one count of first degree murder, one count of sexual assault and two counts of aggravated assault. On November 9, 2001, the State filed a notice of intent to seek the death penalty for the murder and on August 9, 2002, filed its notice of aggravating factors. Trial began February 3, 2003, resulting in conviction by the jury on all counts in the indictment.

## TRIAL ISSUE

**Did the Trial Court Err in Denying Cromwell's Request for New Counsel?**

*Background*

¶19    On November 13, 2002, slightly more than two months before the scheduled start of trial, Cromwell's court-appointed attorney, James Logan, filed a "Motion to Withdraw or in the Alternative Motion to Determine Counsel." The motion was filed in response to Cromwell's *pro se* request that his attorney be removed from the case. On November 20, 2002, the trial court held a hearing and asked Cromwell why he no longer wanted Logan as his lawyer. Cromwell responded:

Mr. Logan and I are on differences [sic] on key points

9

of my defense.  I'm in left field and he's in right field.  He informed me about DNA information at one point in the case and come [sic] back three months later to find out that it was completely false.

At the – I'm not sure that I want to continue to say what he said to me in private and in open court, and what he has also said in court to indicate that Mr. Logan has no intention of defending me zealously.  He has much said in court and on the record that there would be a guilt phase during the trial and he quickly corrected himself in front of you last time I was here, but Mr. Logan said no uncertain terms that not only would I be found guilty, but I will die.  Those were his exact words to me.

That's all, your honor.

¶20     When specifically asked by the trial court regarding what differences existed between himself and Logan, Cromwell stated: "I'm sure he's a great lawyer, but we don't agree on where to go with my defense and especially where the DNA is concerned and one or two witnesses are concerned and specific questions that are supposed to be answered."

¶21     In order to explore the relationship between client and counsel in more detail, the trial judge cleared the courtroom, ordered the transcript portion of this part of the hearing sealed, and continued his investigation regarding Cromwell's motion for new counsel.  During the closed-courtroom discussion, Cromwell informed the trial court that he and Logan had a disagreement.  He indicated four areas in which they differed on the handling of his case.

10

¶22     First, Cromwell said the two disagreed on how to question the State's DNA expert.  Cromwell wanted the expert questioned in a way that would ascertain whether the DNA results were consistent with sexual intercourse.  Logan explained that the DNA expert was not qualified to express an opinion whether the DNA results were consistent with sexual intercourse but was qualified and would testify concerning the presence and quality of DNA evidence allegedly linking Cromwell to the crimes charged.

¶23     Second, Cromwell told the trial court that he and Logan disagreed on whether to call Ella's friend, Kelly Lancaster, to testify at trial.  Logan acknowledged the disagreement but stated that even under Cromwell's approach to the case, calling Lancaster would be a strategically unwise maneuver.

¶24     Third, Cromwell disagreed with Logan's discovery efforts, specifically, his decision not to subpoena the telephone records of Ella Speaks and his failure to obtain Stephanie's school records.  Logan informed the trial court that he had indeed received the relevant telephone records from the State, but that some land-line calls could not be obtained.  Regarding Stephanie's school records, Logan asserted this was the first time he had heard of Cromwell's request for those

11

records.  Logan stated he would attempt to obtain them but questioned whether he would be successful, pointing out that they were victim records, and even if obtained, may not have been admissible.

¶25      Finally, Cromwell asserted that he and Logan differed on how to proceed with the defense of his case and that Logan told him that if he were to proceed to trial, he would be found guilty.  Logan responded:  "I believe I was absolutely required to give him my opinion of the case by the Code of Ethics and to tell him what I thought of it and give him what I thought were potential viable alternatives to what could be a worse situation."  Logan also stated:

> Mr. Cromwell tends to reject anything that I tell him that is not in line with his theory that he be found not guilty and there really is no evidence against him of any sort.  He has instead vastly maintained that there is no evidence against him.  He wanted to go to trial on the first trial setting, because there was no evidence against him.  When I point out to him evidence that is clearly damaging evidence and clearly evidence that would support a conviction, he becomes upset.  He becomes angry with me and I am not assisting him.

¶26      The trial judge denied Cromwell's motion for change of counsel, stating:

> Appellant is not entitled to counsel of choice and is not entitled to a meaningful, that's "meaningful," relationship with his attorney.  I have considered all the relevant factors.  I'll note that the quality of counsel currently representing [Cromwell] is excellent.

I'll note that a significant amount of time has elapsed since the alleged date of violation and since charges were filed. I'll note that trial is set for January 21 of 2003 and we have some motion hearings set for December 6th of this year. I'll note that and confirm what I said earlier, which is, if a new lawyer would be put on the case now, it would lead to a significant delay in the processing of the case, which would be to the prejudice of [Cromwell], to the prejudice of the victims, to the prejudice of the State, and to the prejudice of the interests of justice, not only in the form of resolving matters with due speed, but also in the form of the potential for fading memories.

Counsel and [Cromwell] have a conflict with respect to strategy. To me, this is a conflict that will reappear *ad infinitum* if a new quality lawyer is appointed to represent [Cromwell]. So I could appoint a new counsel, which would lead us back to exactly the same situation that we're in, only it would be about a year later. In other words, to the extent that you could characterize the disagreement between Defense Counsel and [Cromwell] as a conflict, the new lawyer, to the extent [he] is competent counsel, would be confronted with exactly the same conflict.

I'll also note that granting the motion would lead to significant inconvenience to witnesses and victims.

### Standard of Review

¶27 A trial court's decision to deny the request for new counsel will not be disturbed absent an abuse of discretion. *State v. Lee*, 142 Ariz. 210, 220, 689 P.2d 153, 163 (1984).

### Applicable Law

¶28 A criminal defendant has a Sixth Amendment right to representation by competent counsel. U.S. Const. amend. VI; *see*

13

*also* Ariz. Const. art. 2, § 24; A.R.S. § 13-114(2) (2001); Ariz. R. Crim. P. 6.1. A defendant is not, however, entitled to counsel of choice or to a meaningful relationship with his or her attorney. *Morris v. Slappy*, 461 U.S. 1, 13-14 (1983); *State v. Moody*, 192 Ariz. 505, 507, ¶ 11, 968 P.2d 578, 580 (1998).

¶29 The presence of an irreconcilable conflict or a completely fractured relationship between counsel and the accused ordinarily requires the appointment of new counsel. Conflict that is less than irreconcilable, however, is only one factor for a court to consider in deciding whether to appoint substitute counsel. *State v. Henry*, 189 Ariz. 542, 546-47, 944 P.2d 57, 61-62 (1997); *State v. Bible*, 175 Ariz. 549, 591, 858 P.2d 1152, 1194 (1993); *State v. LaGrand*, 152 Ariz. 483, 486-87, 733 P.2d 1066, 1069-70 (1987); *see also Moody*, 192 Ariz. at 508-09, ¶ 21, 968 P.2d at 581-82. A single allegation of lost confidence in counsel does not require the appointment of new counsel, and disagreements over defense strategies do not constitute an irreconcilable conflict. *Henry*, 189 Ariz. at 546-47, 944 P.2d at 61-62; *Bible*, 175 Ariz. at 591, 858 P.2d at 1194.

¶30 To constitute a colorable claim, a defendant's allegations must go beyond personality conflicts or disagreements with counsel over trial strategy; a defendant must

14

allege facts sufficient to support a belief that an irreconcilable conflict exists warranting the appointment of new counsel in order to avoid the clear prospect of an unfair trial. *See Slappy*, 461 U.S. at 13-14; *United States v. Hillsberg*, 812 F.2d 328, 333-34 (7th Cir. 1987) (holding that denial of a motion to substitute counsel is not reversible error when the "defendant abruptly states that he does not trust his attorney but gives no grounds for that distrust . . . or where defendant and counsel have 'personality conflicts and disagreements over trial strategy.'").

¶31     Thus, when considering a motion to substitute counsel, the judge evaluates several factors designed specifically to balance the rights and interests of the defendant against the public interest in judicial economy, efficiency and fairness. *See Moody*, 192 Ariz. at 507, ¶ 11, 968 P.2d at 580.  These include:

> [W]hether an irreconcilable conflict exists between counsel and the accused, and whether new counsel would be confronted with the same conflict; the timing of the motion; inconvenience to witnesses; the time period already elapsed between the alleged offense and trial; the proclivity of the defendant to change counsel; and quality of counsel.

*LaGrand*, 152 Ariz. at 486-87, 733 P.2d at 1069-70; *see also Moody*, 192 Ariz. at 507, ¶ 11, 968 P.2d at 580.

15

*Analysis*

¶32     Cromwell argues that he had irreconcilable differences with Logan and claims the trial court failed to make any meaningful inquiry into the conflict.  The State responds that the conflict between Cromwell and Logan amounted to differences in strategy and personality and that the irreconcilable differences asserted by Cromwell were not substantive, would not affect the quality of representation by otherwise competent counsel and that taking all factors into account, the appointment of new counsel was not warranted under the circumstances.

¶33     Additionally, Cromwell claims the trial court improperly based its decision to deny the change of counsel on delay caused by the state between the day of the crime until the day the indictment was handed up, and the delay following the indictment through discovery and trial.  As noted, however, the trial court considered all of the *LaGrand* factors, including the delay, and concluded that there was insufficient basis on which to justify a substitution of counsel.  The court further concluded that even if new counsel were appointed, Cromwell's assessment of the case would remain unchanged and that new counsel, inevitably, would be confronted with the same disagreement.

16

¶34    Further concerning the *LaGrand* factors, the court found that if new counsel were appointed, the witnesses and victims would be significantly inconvenienced by added delay and that further delays were unwarranted because substantial time had elapsed since the date of the murder, the filing of charges, and the filing of the motion. The court thus concluded that appointing a new lawyer at this stage would be to the prejudice of all interests relevant to the timely administration of justice.

¶35    On review, we conclude the denial of new counsel was based on a proper balancing of relevant interests. Denial of the motion was discretionary and we find no abuse of discretion. There was no irreconcilable conflict between Cromwell and Logan. The friction between them stemmed strictly from disagreement as to their respective assessments of the facts and trial strategy.

¶36    The defense claims this case is similar to our decision in *Moody*. We disagree. The *Moody* record was "replete with examples of a deep and irreconcilable conflict" between the defendant and his attorney. 192 Ariz. at 507, ¶ 13, 968 P.2d at 580. Moody accused his lawyer and the lead public defender of being "incompetent and crazy." *Id*. at 508, ¶ 16, 968 P.2d at 581. He developed an "obsessive hatred" for his attorney and the public defender's office and, on at least one occasion, he

17

and his attorney were "almost at blows" with one another. *Id*. Moody believed his lawyers were conspiring with the prosecutor, the court and the doctor to have him declared insane. *Id*. Moreover, Moody threatened to file ethical complaints against his lawyer and the public defender's office. *Id*. at ¶ 18. None of these is present in the instant case. Cromwell, in open court, stated his belief that Logan was competent and there was no expression of hatred or violence, nor was there an allegation of conspiracy with prosecutors, the court, or the doctors to have Cromwell declared insane. Nor is there anything in the record before us suggesting ethical complaints against Mr. Logan.

¶37    Cromwell's reliance on *Moody* is misplaced. The facts in the instant case do not resemble the intense acrimony and depth of conflict found in *Moody*. Instead, Cromwell's case resembles *LaGrand*, *Henry* and *Bible*, in which the conflicts "amounted to nothing more than a disagreement over appropriate defense strategies," *Henry*, 189 Ariz. at 547, 944 P.2d at 62, and "maybe even some feelings of not getting along so well together." *Bible*, 175 Ariz. at 591, 858 P.2d at 1194. Finally, we defer to the discretion of the trial judge who has seen and heard the parties to the dispute. There was no abuse of discretion by the judge in this instance inasmuch as he did

exactly what we expect trial judges to do: he held a hearing, heard the statements and responses of both the defendant and counsel, gave consideration to each, knew and applied the *LaGrand* factors, and, in a reasonable exercise of discretion, denied the defendant's request.

## SENTENCING ISSUES

### A. Is the "Especially Heinous, Cruel or Depraved" Language of A.R.S. § 13-703(F)(6) Unconstitutionally Vague?

*Standard of Review*

¶38 We review the validity of a statute *de novo* and construe it, whenever possible, to uphold its constitutionality. *State v. Davolt*, 207 Ariz. 191, 214, ¶ 99, 84 P.3d 456, 479 (2004).

*Applicable Law*

¶39 The Eighth and Fourteenth Amendments to the United States Constitution require that a capital sentencing scheme place limits on the discretion of the sentencer. *See Lewis v. Jeffers*, 497 U.S. 764, 774 (1990). The scheme must "'channel the sentencer's discretion by clear and objective standards that provide specific and detailed guidance and that make rationally reviewable the process for imposing a sentence of death.'" *Id.* (quoting *Godfrey v. Georgia*, 446 U.S. 420, 428 (1980)); *see also Woodson v. North Carolina*, 428 U.S. 280, 303 (1976).

19

*Analysis*

**¶40** Cromwell argues that the aggravating factor "especially heinous, cruel or depraved" as set forth in A.R.S. § 13-703(F)(6)[2] is unconstitutionally vague. His contention rests on the distinction created by the Supreme Court in *Ring II* that juries, rather than judges, must find the aggravating factors that can result in the imposition of capital punishment. *Ring v. Arizona ("Ring II")*, 536 U.S. 584 (2002). He claims the Supreme Court's decision in *Walton v. Arizona*, 497 U.S. 639 (1990), *overruled in part by Ring II*, remains instructive because in *Walton*, the Court upheld the "heinous, cruel or depraved" aggravator, but did so only because the Arizona sentencing scheme provided that the aggravating factors and the ultimate sentence were to be determined by the trial judge. *Walton*, 497 U.S. at 654. Using *Walton* as his base of reasoning, Cromwell asserts that the saving factor of Arizona's statute when *Walton* was decided was that the trial judge, not the jury, determined the existence or non-existence of aggravating circumstances.

**¶41** Cromwell cites *Maynard v. Cartwright*, 486 U.S. 356 (1988), and *Godfrey*, 446 U.S. 420, claiming the Supreme Court

---

[2]    We refer to the current version of A.R.S. § 13-703 which lists the "especially heinous, cruel or depraved" language as the (F)(6) aggravator.

20

held that statutory language substantially similar to A.R.S. § 13-703(F)(6) was unduly vague when applied in the context of jury findings.  We disagree.  The holdings in both *Maynard* and *Godfrey* were based not on the language of the sentencing statutes, but on the inadequacy and lack of specificity in the jury instructions.  *See Walton*, 497 U.S. at 653-54.[3]  In our recent decision in *State v. Anderson*, ___ Ariz. ___, ___, ¶¶ 109-14, 111 P.3d 369, 394-95 (2005), the defendant advanced the same argument.  There, we said:

> In Anderson's case, the jury was instructed in detail as to what would support a finding that the murders were "especially heinous, cruel or depraved."  The jury instructions, to which Anderson did not object, gave substance to the terms "cruel" and "heinous or depraved" in accordance with our case law narrowing and defining those terms.  Thus, this case is distinguishable from *Maynard* and *Godfrey* in which no limiting instructions were given . . . .  [W]e conclude that the jury instructions here were adequate to provide a narrowed construction of the facially vague statutory terms.

---

[3]  The Supreme Court overruled *Walton* in *Ring II* only to the extent that juries, rather than judges, must find the existence of aggravating factors.  *Ring v. Arizona*, 536 U.S. 584, 588-89 (2002).  The Court made no mention of the effect of a limiting jury instruction when determining the validity of those aggravators.  In fact, the Supreme Court had previously stated the reason for overturning the sentences in *Maynard v. Cartwright*, 486 U.S. 356 (1988), and *Godfrey v. Georgia*, 446 U.S. 420 (1980), was because of the insufficiency of the limiting instruction, and not the fact that juries were deciding the existence of aggravating factors.  *Walton*, 497 U.S. at 653-54.

*Id.* at ¶¶ 111, 114 (footnotes omitted).[4]

¶42    Similarly, in the instant case, the jury instruction on cruelty contained the essential narrowing factors and provided the specificity and direction required by this court, foreclosing a constitutional challenge to the (F)(6) statute. The jury was instructed that:

> Cruelty goes to mental and physical anguish suffered by the victim. Mental anguish occurs when the victim experiences significant uncertainty about her fate. In order to constitute cruelty, conduct must occur before death and while a victim is conscious. Conduct occurring after death or while a victim is unconscious does not constitute cruelty. Before conduct can be found to be cruel, the State must prove that the defendant knew or should have known that the conduct would cause suffering to the victim.

This language does not suffer from vagueness. *State v. Cañez*, 202 Ariz. 133, 160, ¶ 100, 42 P.3d 564, 591 (2002); *State v. Medina*, 193 Ariz. 504, 513, ¶¶ 34-35, 975 P.2d 94, 103 (1999).

¶43    As in prior decisions, we note once again that the (F)(6) aggravator is stated in the disjunctive, indicating that evidence of any one of the statutory prongs, "heinous," "cruel," or "depraved" will support a finding that the (F)(6) aggravator is present. *Medina*, 193 Ariz. at 513, ¶ 33, 975 P.2d at 103 (citing *State v. Laird*, 186 Ariz. 203, 208, 920 P.2d 769, 774 (1996)). Because we conclude that the jury's cruelty finding is

---

[4]    For a full discussion of the effect of *Walton* on the (F)(6) aggravator in the jury context, see *State v. Anderson*, ___ Ariz.

22

amply supported by the evidence, we need not address Cromwell's challenges to the instructions concerning heinousness or depravity.

¶44     Cromwell also takes issue with the term "especially" as used in (F)(6) to underscore the terms "heinous, cruel or depraved," arguing again that judges understand what the word "especially" means, but that juries do not.  Supreme Court case law, however, dispels that notion because it distinguishes constitutional statutes from unconstitutional statutes on the basis of the clarifying definition, not on the supposition that judges may apply the statute one way and jurors another. *Maynard*, 486 U.S. at 365 (finding an instruction to the jury limiting "especially heinous, atrocious or cruel" to some kind of torture or serious physical abuse as constitutionally acceptable).

¶45     The trial court properly relied on and included language from this court's decisions, cited above, when it drafted the (F)(6) jury instructions.  The instructions given in the instant case provided accurate and carefully drawn guidance for the jurors.  We therefore reject Cromwell's vagueness argument and conclude that A.R.S. § 13-703(F)(6), on the record before us, must be upheld as constitutional.

___, ___, ¶¶ 109-14, 111 P.3d 369, 394-95 (2005).

23

**B. Are Cromwell's Non-Capital Sentences Constitutional in Light of *Blakely v. Washington*?**

¶46      Cromwell does not challenge the statutes on which the non-capital sentences are based, but rather the validity of the sentences themselves.

¶47      The essence of his argument is that he was sentenced unconstitutionally for the non-capital convictions in violation of the Sixth Amendment, citing the Supreme Court's decision in *Blakely v. Washington*, 124 S. Ct. 2531 (2004).

¶48      The jury convicted Cromwell of a single count of sexual assault, a dangerous crime against children, and for that crime, imposed an enhanced statutory sentence of life imprisonment without the possibility of release for thirty-five years. *See* A.R.S. § 13-604.01(A) (Supp. 2001). The jury also convicted him of two counts of aggravated assault, class three dangerous offenses, one involving Stephanie's mother, Ella, and the other involving Kim Jensen. He was given sentences of ten years' imprisonment for each, pursuant to A.R.S. § 13-604(I) (2001).

*The Sexual Assault*

¶49      Cromwell contends that his non-capital sentence for sexual assault was unconstitutional because the trial judge took his probationary status into account as the aggravating factor. Although the trial court found that Cromwell was on probation

24

when he committed the offense, it did not rely on that fact. The sentence was enhanced not on the basis of Cromwell's status as a probationer, but on express findings by the jury that the victim was a child under twelve years of age and that Cromwell was at least eighteen years of age at the time of the crime. The trial court thus gave Cromwell the mandatory sentence on the sexual assault charge pursuant to A.R.S. § 13-604.01(A), which provides:

> A person who is at least **eighteen** years of age and who stands convicted of a dangerous crime against children in the first degree involving sexual assault of a minor who is **twelve** years of age or younger . . . shall be sentenced to life imprisonment and is not eligible for suspension of sentence, probation, pardon or release from confinement . . . until the person has served thirty-five years or the sentence is commuted.

(Emphasis added). Because the jury found all facts necessary under the statute to impose a sentence of life imprisonment, there is no Sixth Amendment violation.

*The Aggravated Assaults*

¶**50**      Cromwell's sentences on the two aggravated assault convictions also do not contravene *Blakely*. The jury expressly found that Cromwell used a dangerous instrument (the pool cue) to commit each assault. The assaults were therefore both class three felonies. *See* A.R.S. § 13-1204(A)(1) & (B) (Supp. 2001). Under A.R.S. § 13-604(I), the presumptive sentence for a class three felony involving the use of a dangerous instrument is

25

seven and one-half years. However, the presumptive sentence may be aggravated to a maximum of fifteen years pursuant to § 13-702(C). That statute permits aggravation when "[t]he defendant was previously convicted of a felony within the ten years immediately preceding the date of the offense." A.R.S. § 13-702(C)(11) (Supp. 2001).

¶51 The superior court increased each aggravated assault sentence to ten years based on two prior felony convictions in Cromwell's record. Prior convictions constitute an exception to the jury requirement and need only be found by the trial judge. *Blakely*, 124 S. Ct. at 2536; *Apprendi v. New Jersey*, 530 U.S. 466, 490 (2000). Thus, the ten-year sentences on these convictions, being within the prescribed range, did not violate Cromwell's Sixth Amendment rights under *Blakely*.

### INDEPENDENT REVIEW OF DEATH SENTENCE

¶52 This court is required by statute not only to review all death sentences, but also to perform a separate, independent review of each aggravating factor found by the jury and any mitigating evidence for the purpose of determining the propriety of the death penalty:

> The supreme court shall review all death sentences. On review, the supreme court shall independently review the trial court's findings of aggravation and mitigation and the propriety of the death sentence.

26

A.R.S. § 13-703.04(A) (Supp. 2003)[5].

¶53     Although Cromwell has not raised a question about the independent review process and the propriety of the death sentence, the statutory mandate to this court is clear:

> If the supreme court determines that an error was made regarding a finding of aggravation or mitigation, the supreme court shall independently determine if the mitigation the supreme court finds is sufficiently substantial to warrant leniency in light of the existing aggravation. If the supreme court finds that the mitigation is not sufficiently substantial to warrant leniency, the supreme court shall affirm the death sentence. If the supreme court finds that the mitigation is sufficiently substantial to warrant leniency, the supreme court shall impose a life sentence pursuant to § 13-703, subsection A.

A.R.S. § 13-703.04(B). This language is identical to superseded A.R.S. § 13-703.01(B), which was applicable during the time trial judges performed the entire sentencing function. Under the superseded statute, we determined that in the process of conducting this court's independent review, "we consider the quality and the strength [of the aggravating and mitigating factors], not simply the number." *State v. Greene*, 192 Ariz. 431, 443, ¶ 60, 967 P.2d 106, 118 (1998). Because of the identical statutory language, our role in the independent review process has not been altered. We therefore proceed as before.

---

[5]     A.R.S. § 13-703.01 was renumbered as § 13-703.04 in 2002. Although the wording is unchanged, we cite to the current version here.

27

¶54     Reviewing the capital aggravators in this case is not complex. The jury found two in support of the death penalty: 1) that the murder was committed in an especially heinous, cruel or depraved manner[6] (A.R.S. § 13-703(F)(6)); and 2) that the victim was under the age of fifteen years (A.R.S. § 13-703(F)(9)). These aggravators were essentially uncontested.[7]

¶55     The record is replete with evidence of cruelty. Stephanie, the eleven-year-old victim, unquestionably suffered unspeakable mental anguish, given the medical examiner's finding that she was still alive at the time of the stabbing injuries and the sexual assault. The crimes committed by Cromwell against the child bespeak horrific cruelty. Eleven-year-old Stephanie, given her tender age, was made to suffer pre-death anguish by conduct indescribable except in the most repulsive terms.

¶56     In *Greene*, although there was but one aggravator and several mitigators, we concluded that the evidence of mitigation

---

[6]     The superior court in this case wisely employed the recommended procedure and asked the jury to return separate verdicts as to each prong of the (F)(6) aggravator. *See State v. Anderson*, ___ Ariz. ___, ___, ¶ 131, 111 P.3d 369, 398 (2005) (recommending this procedure). The jury found that each was satisfied: the murder was heinous, the murder was cruel, and the murder was depraved.

[7]     Cromwell did not dispute the way in which Stephanie was killed, or her age. He simply maintained that he did not commit the crime.

was nevertheless insufficient to warrant leniency and upheld the death sentence. *Id*. at 443-44, ¶ 60, 967 P.2d at 118-19. In reweighing the aggravators and mitigators as required by the statute, we have uniformly focused on the quality, not the quantity, of the factors. *See, e.g., State v. Rogovich*, 188 Ariz. 38, 45-46, 932 P.2d 794, 801-02 (1997) (holding that the quality of three aggravators outweighed the value of six mitigators and that the death penalty was appropriate).

¶57 The mitigating factors, consisting of Cromwell's less than adequate childhood experiences and his mental state, were remarkably weak. Weighed against the aggravating factors, the evidence of mitigation deserves inconsequential weight. We conclude, therefore, that the evidence of mitigation is not sufficiently substantial to warrant leniency.

**CONSTITUTIONAL CLAIMS RAISED TO PREVENT FEDERAL PRECLUSION**

¶58 1. The prosecutor's discretion to seek the death penalty has no standards and therefore violates the Eighth and Fourteenth Amendments to the United States Constitution and Article 2, Sections 1, 4, and 15 of the Arizona Constitution. Rejected by *State v. Sansing*, 200 Ariz. 347, 361, ¶ 46, 26 P.3d 1118, 1132 (2001), *vacated on other grounds, Ring v. Arizona*, 536 U.S. 584 (2002); *State v. Rossi*, 146 Ariz. 359, 366, 706 P.2d 371, 378 (1985).

¶59    2.    Arizona's death penalty applies discriminatorily against poor, young, and male defendants, in violation of Article 2, Sections 1, 4, and 13 of the Arizona Constitution. Rejected by *Sansing*, 200 Ariz. at 361, ¶ 46, 26 P.3d at 1132.

¶60    3.    The death penalty is cruel and unusual under any circumstance and violates the Eighth and Fourteenth Amendments to the United States Constitution and Article 2, Section 15 of the Arizona Constitution.    Rejected by *State v. Harrod*, 200 Ariz. 309, 320, ¶ 59, 26 P.3d 492, 503 (2001).

¶61    4.    The absence of proportionality review of death sentences by Arizona courts denies capital defendants due process of law and equal protection and amounts to cruel and unusual punishment, in violation of the Fifth, Eighth, and Fourteenth Amendments to the United States Constitution and Article 2, Section 15 of the Arizona Constitution.    Rejected by *Harrod*, 200 Ariz. at 320, ¶ 65, 26 P.3d at 503; *State v. Salazar*, 173 Ariz. 399, 416, 844 P.2d 566, 583 (1992).

¶62    5.    Arizona's capital sentencing scheme is unconstitutional because it does not require that the State prove the death penalty is appropriate, in violation of the Fifth, Eighth and Fourteenth Amendments to the United States Constitution and Article 2, Section 15 of the Arizona Constitution.    Rejected by *State v. Ring*, 200 Ariz. 267, 284, ¶

30

64, 25 P.3d 1139, 1156 (2001), *rev'd on other grounds, Ring v. Arizona*, 536 U.S. 584 (2002).

**¶63**      6.   The death penalty is cruel and unusual because it is irrationally and arbitrarily imposed and serves no purpose that is not adequately addressed by life in prison, in violation of the defendant's right to due process under the Fourteenth Amendment to the United States Constitution and Article 2, Sections 1 and 4 of the Arizona Constitution.   Rejected by *State v. Pandeli*, 200 Ariz. 365, 382, ¶ 88, 26 P.3d 1136, 1153 (2001), *vacated on other grounds, Ring v. Arizona*, 536 U.S. 584 (2002); *State v. Beaty*, 158 Ariz. 232, 247, 762 P.2d 519, 534 (1988).

**¶64**      7.   Arizona's death penalty scheme does not provide a defendant convicted of a capital crime the opportunity to death-qualify the sentencing judge, in violation of the Eighth and Fourteenth Amendments to the United States Constitution and Article 2, Section 15 of the Arizona Constitution.   Rejected by *Pandeli*, 200 Ariz. at 382, ¶ 89, 26 P.3d at 1153.

**¶65**      8.   A.R.S. § 13-703 provides no objective standards to guide the jurors in weighing the aggravating and mitigating circumstances and therefore violates the Eighth and Fourteenth Amendments to the United States Constitution and Article 2, Section 15 of the Arizona Constitution.   Rejected by *Pandeli*, 200 Ariz. at 382, ¶ 90, 26 P.3d at 1153.

31

¶66    9.  A.R.S. § 13-703 does not sufficiently channel the sentencing jurors' discretion because the broad scope of Arizona's aggravating factors encompasses nearly anyone involved in a murder, violating the Eighth and Fourteenth Amendments to the United States Constitution and Article 2, Section 15 of the Arizona Constitution.  Rejected by *Pandeli*, 200 Ariz. at 382, ¶ 90, 26 P.3d at 1153.

¶67    10. Execution by lethal injection is cruel and unusual punishment.  Rejected by *State v. Van Adams*, 194 Ariz. 408, 422, ¶ 55, 984 P.2d 16, 30 (1999).

¶68    11. A proportionality review of a death sentence is constitutionally required.  Rejected by *State v. Gulbrandson*, 184 Ariz. 46, 73, 906 P.2d 579, 606 (1995).

¶69    12. Arizona's death penalty statute violates the Eighth and Fourteenth Amendments to the United States Constitution and Article 2, Sections 4 and 15 of the Arizona Constitution because it does not require multiple mitigating facts to be considered cumulatively or require the trial court to make specific findings as to each mitigating factor. Rejected by *State v. Van Adams*, 194 Ariz. at 423, ¶ 55, 984 P.2d at 31.

¶70    13. Arizona's death penalty statute is constitutionally defective because it requires defendants to

32

prove that their lives should be spared.  Rejected by *State v. Fulminante*, 161 Ariz. 237, 258, 778 P.2d 602, 623 (1988).

**CONCLUSION**

¶71     For the reasons stated, we affirm all of Cromwell's convictions and sentences.

_____
Charles E. Jones, Justice (Retired)

CONCURRING:

_____
Ruth V. McGregor, Chief Justice

_____
Rebecca White Berch, Vice Chief Justice

_____
Michael D. Ryan, Justice

_____
Andrew D. Hurwitz, Justice