NOTICE: NOT FOR OFFICIAL PUBLICATION.
UNDER ARIZONA RULE OF THE SUPREME COURT 111(c), THIS DECISION IS NOT PRECEDENTIAL
AND MAY BE CITED ONLY AS AUTHORIZED BY RULE.

IN THE

# ARIZONA COURT OF APPEALS
### DIVISION ONE

STATE OF ARIZONA, *Appellee*,

*v.*

GARY LENALL COX, *Appellant*.

No. 1 CA-CR 24-0550

FILED 04-10-2026

Appeal from the Superior Court in Maricopa County
No. CR2021-002262-001
The Honorable Mark H. Brain, Judge

**AFFIRMED**

COUNSEL

Arizona Attorney General's Office, Phoenix
By Michael O'Toole
*Counsel for Appellee*

Gary Lenall Cox, Winslow
*Appellant*

Kenney Law LLC, Florence
By Anthony Louis Kenney
*Advisory Counsel for Appellant*

Arizona Voice for Crime Victims, Phoenix
By Jessica Gattuso
*Counsel for Crime Victim*

_____

**MEMORANDUM DECISION**

Presiding Judge Michael S. Catlett delivered the decision of the Court, in which Judge Angela K. Paton and Judge Jennifer M. Perkins joined.

_____

**C A T L E T T**, Judge:

**¶1** Gary Lenall Cox ("Cox") appeals his convictions for first-degree murder, kidnapping, and tampering with physical evidence. Cox argues the superior court erred by denying his motion to change counsel, prohibiting his expert witnesses from testifying, incorrectly instructing the jury on first-degree murder, and failing to either grant his motion for mistrial or give the jury his proposed curative instruction. Because the court did not err in any respect, we affirm.

## FACTS AND PROCEDURAL HISTORY

**¶2** In mid-2020, Julia (a pseudonym) obtained a hotel room in Tempe through the "HOPE" program, which provides housing for individuals trying to get their lives in order. Cox was also staying at the hotel through the program, but he declined to engage in services, so the program paid for Cox to stay for only one weekend. The program prohibited Julia from having overnight guests, but by the end of July, Cox began staying in her room.

**¶3** In early August, program staff informed Julia she could be terminated from the program if Cox stayed with her. On August 6, at about 7:00 p.m., Cox texted a program staff member that he and Julia were "a couple" and that the program should "take care of the move-in fee situation so [they] can get on with their lives."

**¶4** Later that night, at about 1:00 a.m., an occupant in the room next to Julia's heard a "loud bang" that startled him. Loud banging continued randomly throughout the night.

**¶5** The next morning, Cox called his brother, Arthur, saying "I need you, I need your help." Arthur said he could not help because he was traveling to Las Vegas. Cox asked to go with him, but Arthur said no and hung up. Cox called back crying and said he needed Arthur's help, Julia was dead, and "that he's going to prison." Arthur hung up and called their mother. Cox's mother and sister called the police.

¶6          Officers responded to Julia's hotel room. Julia was on the floor; she was not breathing and had a "tremendous amount of wounds." The room was in disarray as if a struggle had occurred and there were apparent blood stains throughout. The police found an empty bleach bottle and the room smelled like bleach; there was also a pile of wet women's clothing and it appeared someone tried to clean up the scene.

¶7          Later, Arthur informed the police that Cox was at a bus stop. Officers responded and arrested Cox. At the time of his arrest, Cox had Julia's cellphone and his hands were noticeably swollen.

¶8          A grand jury indicted Cox for first-degree murder, kidnapping, and tampering with physical evidence. During pre-trial proceedings, Cox requested that his counsel withdraw from representing him due to "irreconcilable differences." At a hearing, Cox argued "the problem started" during his counsel's second visit when counsel told him to "shut up" and attempted to "bully" him to "give him a plea." Cox's counsel explained that he was informing Cox that the State would not make an offer, so Cox would need to make one. Counsel said he had a letter documenting the interaction. Counsel explained he attempted to visit Cox nine times, but Cox did not show up on two occasions. Cox disputed that he failed to show up. Cox's counsel expressed his belief that it did not matter who defended Cox because he "wants to control the show," and counsel speculated that Cox may prefer a female attorney because "he feels it is easier to manipulate them."

¶9          The court denied Cox's motion, explaining that while Cox was "verbose" and his attorney was "curt," the only characteristic Cox was entitled to from his assigned counsel is competence. The court explained that appointed counsel was "a good attorney" and that the disagreement was based on counsel's knowledge of what is "important" versus what was not "going to work[.]" The court acknowledged that, at that time, trial was set for less than a month later. Even after the court denied new counsel, Cox persistently requested one. After the court granted Cox's request to represent himself, Cox still requested that the court replace counsel (who was now serving as advisory counsel) based largely on his initial argument.

¶10          Beginning in February 2023, Cox filed multiple "case management reports." He listed multiple items "to be completed" before the next case management conference, including "the selection of experts." Then Cox requested a 150-day continuance, claiming "extraordinary circumstances" because he had "not yet procured the services and reports" of expert witnesses or conducted witness interviews. In June 2023, the court

granted a three-month continuance and rescheduled the trial assignment date for the end of September 2023.

¶11      Cox later requested another continuance because of the "overall failing services" of his preferred investigator, alleging he "manipulated both the situation and [himself]" regarding the "selection process of [his] experts."  At a hearing, the court told Cox his motion was "vague" and that the court needed to know what Cox "still need[ed] to do," "how much time it's going to take," and why he hasn't "done that yet."  Cox responded that "there are no major issues other than me trying to acquire the evidence necessary to refute . . . the prosecution claims."  The court stated it sounded like both sides would be ready to schedule trial at a trial setting calendar on January 8, 2024, and set a final pretrial conference for January 3, 2024.

¶12      Approximately three weeks before the scheduled trial setting date, Cox filed another case management report stating that a "disclosure of the defense experts may be forth-coming" but that those experts needed to obtain information to create a report.  At a pretrial hearing, the court reminded Cox that while he was "entitled to an expert . . . there are deadlines."  Approximately two weeks later, Cox filed a "supplemental disclosure of defense witness and experts."  Cox named three individuals who he said would testify as a "toxicologist," "forensic and clinical psychologist," and a "criminologist."

¶13      Less than a week before the final pretrial conference, Cox requested another continuance for his experts to "review the evidence[.]"  He submitted affidavits from his experts explaining they needed more time to conduct an examination, review the evidence, and form their opinions.  Cox explained he first tried to "reach out" to experts two months earlier.  The court denied the motion because Cox did not demonstrate reasonable efforts to timely request experts and he could not show good cause.  Cox argued he timely disclosed his experts.  The court disagreed.  The court reasoned that Cox had retained the experts only a couple weeks earlier, and he had not properly disclosed their opinions.  Cox argued he disclosed experts earlier but they were "switched."  But Cox agreed that his experts gave "no actual opinion" because they still needed time for "testing" and to "generate additional reports[.]"  He said he should have the "equal [ ] right to present experts[.]"  The court reminded Cox that he "had that right" but it was "conditioned on timely disclosing the substance of their opinions."  Because Cox had not timely disclosed his experts, they would not be permitted to testify.

¶14         In the preliminary jury instructions, the court proposed giving the following instruction on the elements for first-degree murder:

> The crime of First Degree Murder requires proof that [the defendant]:
>
> 1. caused the death of another person; *and*
>
> 2. intended or knew that he would cause the death of another person; *and*
>
> 3. acted with premeditation.

After each of the counts, the preliminary instructions also told the jury that "[t]he State must prove each element of the charged crimes beyond a reasonable doubt."

¶15         Cox objected.  He requested that the instruction for first-degree murder perfectly mirror the elements of the crime as set out in A.R.S. § 13-1105.  That statute lists "[t]he defendant intended or knew that he would cause the death of a person, and thus, caused the death" first.  The court denied Cox's request because it was "standard" for the first-degree murder instruction to list "[c]ause of death" first, and "the order doesn't matter" because the elements are separated by the word "and."

¶16         At trial, an officer testified that Cox's family requested a welfare check after reporting they had received a call from Cox who was "hysterical" and had said "he had just murdered his girlfriend[.]"  Cox objected based on hearsay and the court sustained that objection.  Cox requested a mistrial on grounds there was no report that included a statement referring to him murdering his girlfriend.  The court denied the mistrial request because the report used the word "killed," but the court said it court would "be happy to consider a curative instruction."  The court also asked the officer to look at the report and tell the jury whether the word "murder" appeared in it.  The officer said "[n]o, it does not."

¶17         Cox moved to reconsider his mistrial request.  Alternatively, Cox requested a curative instruction saying that the officer

> testified about a statement purportedly made by the Defendant . . .  No portion of this statement was ever made by the Defendant to anyone, . . .  This jury is to disregard the statement completely and can give it a negative inference

against both the prosecution and against [the officer] for
trying to introduce this false statement.

The court denied the motion, stating the testimony could be "easily
remedied" by asking witnesses clarifying questions.

¶18        The court agreed with the State's suggestion to ask its final
witness, a detective, if he had "reviewed the interview" and could confirm
that the caller "did not have any firsthand information." The next day the
court reminded Cox about the line of questions the State could ask the
detective. The court also reminded Cox that the court previously attempted
to "fix" the issue and had offered to give a curative instruction, but that Cox
had not requested one. The court asked Cox how he would prefer to
proceed. Cox reminded the court that he had included a proposed curative
instruction with his reconsideration request, and he indicated that he
preferred the curative instruction. The State still asked the detective if Cox's
sister or mother "had firsthand knowledge about what happened" or
whether the detective had "any reason to believe" Cox's sister or mother
"spoke directly to [Cox] about what happened[?]" The detective answered
that, at the time they called the police, neither Cox's sister nor mother had
spoken to Cox or had firsthand knowledge about what had happened to
Julia. The detective also testified that the only family member who spoke
directly to Cox on August 7, 2020, was his brother, who testified at trial
consistently with what he told police that day.

¶19        Days later, when reviewing the final jury instructions, Cox
asked the court about his proposed curative instruction. The court
responded that it thought the issue was resolved when the State asked the
detective clarifying questions. Cox again provided the court with his
proposed instruction. The court rejected it because it would be "wholly
improper" to give a negative inference. The court informed Cox that
although it initially considered giving a curative instruction, the detective's
testimony "cured the prejudice." The court said it would "leave things
where they are" but permitted Cox to remind the jury that his other
relatives did not "have any idea what was going on[.]" The court also
instructed the jury as follows: "[y]ou're to determine what the facts in the
case are from the evidence produced in court. If the Court sustained an
objection to a lawyer's question, you must disregard it and any answer
given."

¶20        The jury found Cox guilty on all three counts, and the court
sentenced him to natural life in prison for first-degree murder, as well as 28
years for kidnapping and 4.5 years for tampering with evidence. The court

ordered the sentences for first-degree murder and kidnapping to run concurrently but consecutive to the sentence for tampering with evidence.

**¶21**         The court later granted Cox's request to file a delayed notice of appeal.  We have jurisdiction.  *See* A.R.S. § 13-4033.

**DISCUSSION**

**I.        Change of Counsel**

**¶22**         Cox argues the court erred by denying his motion to change counsel.  We review the superior court's denial of a request for new counsel for an abuse of discretion.  *State v. Champagne*, 247 Ariz. 116, 127 ¶ 6 (2019).

**¶23**         The Sixth Amendment gives a criminal defendant a right to counsel, but a defendant is not "entitled to counsel of choice or to a meaningful relationship with his or her attorney."  *State v. Cromwell*, 211 Ariz. 181, 186 ¶ 28 (2005).  To show a Sixth Amendment violation, a defendant must allege more than personality conflicts or strategy disagreements with counsel; he must allege facts showing an "irreconcilable conflict exists," risking "an unfair trial."  *Id.* at 187 ¶ 30.  The court then considers these seven factors:

> (1) whether an irreconcilable conflict exists between counsel and the accused;
>
> (2) whether new counsel would be confronted with the same conflict;
>
> (3) the timing of the motion;
>
> (4) inconvenience to witnesses;
>
> (5) the time period already elapsed between the alleged offense and trial;
>
> (6) the proclivity of the defendant to change counsel; and
>
> (7) quality of counsel.

*State v. LaGrand*, 152 Ariz. 483, 486–87 (1987).  It is preferable for the superior court to "make explicit *LaGrand* findings," but we still affirm when the record demonstrates that the court "adequate[ly] consider[ed]" the relevant factors.  *Champagne*, 247 Ariz. at 130 ¶ 21.

7

¶24         While the court did not explicitly discuss every *LaGrand* factor, Cox failed to establish "a severe and pervasive conflict" or come forward with evidence of "such minimal contact . . . that meaningful communication was not possible." *State v. Hernandez*, 232 Ariz. 313, 318 ¶ 15 (2013) (citation omitted). Simply declaring that he had an "irreconcilable conflict" with counsel was not enough.

¶25         Instead, Cox met with his attorney multiple times, and the court recognized that Cox's appointed counsel was "a good attorney." The court determined Cox's disagreement with counsel stemmed from different communication styles and on counsel's insistence that Cox focus on what was "important" rather than what was not "going to work[.]" The court acknowledged that, at the time, Cox's trial was scheduled to start in less than a month. And the court heard counsel's argument that Cox's behavior was likely to persist even with new counsel. The court did not abuse its discretion in denying Cox's request for new counsel.

## II.    Expert Witnesses and Motion to Continue

¶26         Cox next argues the court denied him due process by denying his motion to continue and precluding his experts from testifying. We review a court's decision about whether a witness is qualified as an expert for an abuse of discretion. *State v. Keener*, 110 Ariz. 462, 465–66 (1974). We similarly review the court's denial of a motion to continue for an abuse of discretion, but a defendant is also required to demonstrate prejudice. *State v. Forde*, 233 Ariz. 543, 555 ¶ 18 (2014).

¶27         To properly disclose an expert witness, a defendant must disclose the "name, address, and qualifications" of any expert expected to testify, and "any report" along with the results of tests, experiments, examinations, or comparisons the expert completed. Ariz. R. Crim. P. 15.2(c)(2)(A)–(B). Unless the court orders otherwise, the deadline for a criminal defendant to disclose an expert is "40 days after arraignment" or "10 days after" the State discloses, whichever comes first. Ariz. R. Crim. P. 15.2(d). If a court finds that a defendant did not properly or timely disclose, the court may impose an appropriate sanction, including precluding an expert witness from testifying under certain circumstances. Ariz. R. Crim. P. 15.7(b)–(c). The court may grant a continuance "only on a showing that extraordinary circumstances exist, and that delay is indispensable to the interests of justice[.]" Ariz. R. Crim. P. 8.5(b).

¶28         We disagree with the premise that the court precluded Cox's expert opinions, at least in the traditional sense. After all, the court could

not preclude opinions Cox never disclosed. Rather, Cox identified certain individuals he hoped would provide expert testimony, but by the eve of trial, those individuals still had not conducted the work necessary to form final opinions. Despite that nearly a year passed after the court continued trial for Cox to prepare his experts, those experts remained in the preliminary stages of reviewing information and performing examinations.

**¶29** In fact, without knowing what his experts' opinions would have been, Cox can only speculate whether he would have wanted those experts to testify. To be sure, Cox indicated what testimony he preferred his experts would offer. But without those individuals actually formulating their opinions, Cox can only speculate what their testimony would have been. And without knowing their opinions, we have no way of knowing whether their testimony was admissible. These issues stem entirely from Cox's failure to follow the rules for timely and proper expert disclosure. *See* Ariz. R. Evid. 702; Ariz. R. Crim. P. 15.2(c)–(d).

**¶30** The court also did not abuse its discretion in denying Cox's motion to continue. Cox did not show good cause why his putative experts only started their work a short time before trial was to start. Cox blames Inmate Legal Services for failing to process, and instead returning, a motion he claims he submitted on December 7. He also claims he filed a motion with affidavits from his experts one day before the court listed it as filed. Even assuming these assertions are true, they account for only a few days' delay; they do not explain why it took Cox almost a year to reach even the initial stages of obtaining expert opinions after the court granted him a lengthy continuance. And again, because Cox's putative experts were only at the preliminary stages of forming their opinions, Cox can only speculate about what opinions they would have eventually offered. So he cannot demonstrate that the superior court's decision denying his motion to continue caused him prejudice.

## III.    Premeditated Murder Instruction

**¶31** Cox also argues the court's preliminary jury instruction defining first-degree murder was inconsistent with the murder statute because the court listed the elements out of order. Notably, Cox did not object to the court's final jury instruction on first-degree murder, which was identical to the preliminary instruction.

**¶32** We review whether the superior court's instructions both properly instructed the jury and stated the law de novo. *State v. Robinson*,

253 Ariz. 121, 140 ¶ 53 (2022). The court errs when it gives a misleading instruction. *State v. Kuhs*, 223 Ariz. 376, 384 ¶ 37 (2010).

¶33 Arizona law defines first-degree murder as "[i]ntending or knowing that the person's conduct will cause death, the person causes the death of another person, . . . with premeditation[.]" A.R.S. § 13-1105(A)(1).

¶34 The Revised Arizona Jury Instruction ("RAJI") for first-degree murder is, in relevant part, this:

> The crime of first-degree premeditated murder requires proof that the defendant:
>
> 1. caused the death of another person; *and*
>
> 2. intended or knew that [he] [she] would cause the death of another person; *and*
>
> 3. acted with premeditation.

Rev. Ariz. Jury Instr. (Crim.), First Degree Premeditated Murder 11.05, at 115 (6th ed. 2025).

¶35 And the superior court in this case instructed the jury on first-degree murder as follows:

> The crime of First Degree Murder requires proof that the defendant:
>
> 1. Caused the death of another person; *and*
>
> 2. Intended or knew that he would cause the death of another person; *and*,
>
> 3. Acted with premeditation.

Cox theorizes that a jury would fixate on the first element and decide first-degree murder without considering the remaining elements. We disagree.

¶36 First "[t]he court's . . . instruction substantively mirrored th[e] statutory language." *Paz v. City of Tucson*, 256 Ariz. 391, 395 ¶ 11 (App. 2023). And the court's instruction matched the RAJI. *See State v. Rushing*, ___ Ariz. ___, 573 P.3d 72, 84 ¶ 36 (2025) ("[A]lthough the RAJIs are not infallible, they are generally considered to accurately state the law."). "Nothing in [any] Arizona case suggests that courts must provide juries

with formulaic plug-and-play instructions." *State v. Riley*, 248 Ariz. 154, 184 ¶ 109 (2020). Next, by using the word "and" after the first and second elements, the instruction used a "phrase[ ] expressing the idea that the latter is to be added or taken along with the first." *See Bither v. Country Mut. Ins. Co.*, 226 Ariz. 198, 200 ¶ 10 (App. 2010). By connecting the three elements with "and," the instruction ensured the jury knew it needed to find all three elements to find Cox guilty; the instruction clearly communicated that finding Cox guilty on only one element was insufficient. Finally, the court instructed the jury that the State "must prove each element of the charged crimes beyond a reasonable doubt." We presume the jury followed that instruction. *State v. Payne*, 233 Ariz. 484, 518 ¶ 151 (2013). In each of these ways, the court correctly instructed the jury on the law and ensured it understood that it needed to find all three elements of first-degree murder to convict. The court did not err.

## IV. Curative Instruction or Mistrial

**¶37** Cox argues the court erred by failing to give the jury his curative instruction to rectify inaccurate hearsay testimony from a police officer. "We review a trial court's failure to grant a mistrial for an abuse of discretion." *State v. Moody*, 208 Ariz. 424, 456 ¶ 124 (2004). We also review the court's denial of a proposed jury instruction for an abuse of discretion. *State v. Cox*, 217 Ariz. 353, 356 ¶ 15 (2007).

**¶38** Due to the officer's testimony, Cox argues the court should have either granted a mistrial or given his curative instruction. But a court has several options when remedying objectionable testimony. *See State v. Dann*, 205 Ariz. 557, 571 ¶ 48 (2003) (permitting a curative instruction to cure error in witness testimony); *see also Zuluaga v. Bashas', Inc.*, 242 Ariz. 205, 211 ¶ 18 (App. 2017) (describing options the court has for remedying an improper statement, including sustaining an objection, admonishing the jury, providing a curative instruction, or ordering a mistrial). Even when the court chooses to give a curative instruction, it does not have to give an instruction the defendant proffers. *See Cox*, 217 Ariz. at 356 ¶ 17 (a court does "not err by refusing to give instructions that misstate the law").

**¶39** The court is "in the best position to determine an appropriate remedy for trial error that will preserve a defendant's right to a fair trial." *State v. Herrera*, 203 Ariz. 131, 135 ¶ 6 (App. 2002). Cox presented the court with two options. Cox proposed a mistrial, which is "the most dramatic remedy for trial error and should be granted only when it appears that justice will be thwarted[.]" *State v. Leteve*, 237 Ariz. 516, 526 ¶ 33 (2015) (citation omitted). And Cox proposed a curative instruction containing a

negative inference against both the State and the officer. Because the court chose not to give a curative instruction or declare a mistrial, we examine the alternative steps the court took to cure the testimony.

**¶40** First, the court sustained Cox's objection to the testimony. Second, the court asked the officer who gave the objectionable testimony to look at a police report and tell the jury whether the word "murder" appeared in it. The officer said "[n]o, it does not." Third, the State later asked a detective if Cox's mother or sister "had firsthand knowledge about what happened" or whether he had "any reason to believe" they "spoke directly to [Cox] about what happened[?]" The detective clarified that, at the time they called the police, neither Cox's sister nor mother had spoken to Cox or had firsthand knowledge about what had happened to Julia. The detective also testified that the only family member who spoke directly to Cox on August 7, 2020, was his brother, who testified at trial consistently with what his brother also told police that day—that Cox told him Julia was dead and that Cox was going to prison. Fourth, the court permitted Cox to remind the jury that his mother and sister did not "have any idea what was going on[.]" Fifth, the court instructed the jury "to determine what the facts in the case are from the evidence produced in court. If the Court sustained an objection to a lawyer's question, you must disregard it and any answer given." Sixth, the court correctly concluded that the curative instruction Cox proffered, which would have instructed the jury to take a negative inference against the State, was unwarranted.

**¶41** The court's actions sufficiently cured the officer's objectionable testimony and ensured that all parties received a fair trial. The court did not abuse its discretion in refusing any further remedy.

## CONCLUSION

**¶42** We affirm.



MATTHEW J. MARTIN • Clerk of the Court
**FILED**: JR