IN THE

# SUPREME COURT OF THE STATE OF ARIZONA

———————————

STATE OF ARIZONA,
*Appellee,*

*v.*

ROBERT HERNANDEZ,
*Appellant.*

———————————

No. CR-10-0415-AP
Filed July 26, 2013

———————————

Appeal from the Superior Court in Maricopa County
The Honorable Sally Schneider Duncan, Judge
No. CR2008-124043-001
**AFFIRMED**

———————————

COUNSEL

Thomas C. Horne, Arizona Attorney General, Jeffrey A. Zick, Chief Counsel, Kent E. Cattani, Former Chief Counsel Criminal Appeals/Capital Litigation, Ginger Jarvis, Assistant Attorney General (argued), Phoenix, for State of Arizona

Michael J. Dew (argued), Michael J. Dew Attorney At Law, Phoenix, for Robert Hernandez

———————————

JUSTICE BRUTINEL authored the opinion of the Court, in which CHIEF JUSTICE BERCH, VICE CHIEF JUSTICE BALES, JUSTICE PELANDER, and JUSTICE TIMMER joined.

———————————

JUSTICE BRUTINEL, opinion of the Court:

¶1     A jury found Robert Hernandez guilty of murdering Jeni Sanchez-Rivera, her husband, Omar Guzman Diaz, and Omar's younger brother, Pablo Guzman Diaz, as well as attempted murder for shooting and seriously injuring Maria Elodia Diaz-Payan. The jury determined Hernandez should be sentenced to death for each murder. We have

jurisdiction over this automatic appeal pursuant to Article 6, Section 5(3) of the Arizona Constitution and A.R.S. § 13-4031.[1]

## I. FACTUAL AND PROCEDURAL BACKGROUND[2]

¶2 In April 2008, Maria Diaz-Payan traveled to Phoenix to visit her friend, Jeni Sanchez-Rivera, who lived with her husband, Omar Guzman Diaz. After Maria's arrival, she, Jeni, Jeni's son, and Jeni's friend, Sonia Gonzalez, took a short trip to New Mexico in a car rented by Sonia's mother, Martha Gonzalez.

¶3 Sonia Gonzalez is the mother of Hernandez's three children. While in New Mexico, Sonia missed a birthday party for one of her and Hernandez's children, Angel, which angered Hernandez.

¶4 The day after returning from New Mexico, Jeni and Maria met Omar and Omar's younger brother, Pablo Guzman Diaz, and drove to Jeni's house in Peoria. Upon arriving, Omar and Pablo entered the house first, while Jeni and Maria stayed in the car. Shortly thereafter, Hernandez came outside and walked toward the car. Although Maria did not know Hernandez, Jeni referred to him as "Bobby." Removing a gun from his pants, Hernandez forced Maria and Jeni into the house, telling them not to scream or make any noise.

¶5 Once inside, Maria could hear Omar and Pablo crying and shouting from inside Jeni's bedroom. While Hernandez forced Maria and Jeni down a corridor to another bedroom, Maria saw another man wearing a ski mask and holding a pistol in Jeni's bedroom. She could hear Omar and Pablo pleading for the men not to hurt them or their family. Maria heard Omar ask Hernandez, "What harm have we done to you, Bobby?"

¶6 Hernandez bound Jeni's and Maria's hands behind their backs. While on the bedroom floor, Maria did not look at her captors' faces, hoping they would not harm her. Maria heard Hernandez and Jeni talk about Sonia. Then, Maria heard Hernandez slap Jeni.

---

[1] We cite the current version of statutes that have not materially changed since the events at issue.

[2] The facts are presented in the light most favorable to sustaining the jury's verdicts. *State v. Hardy*, 230 Ariz. 281, 284 ¶ 2 n.2, 283 P.3d 12, 15 n.2 (2012).

¶7     After Hernandez returned to Omar and Pablo, Maria heard several gunshots, and Omar's and Pablo's cries ended.  Shortly thereafter, Hernandez and the masked man walked to the bedroom where Maria and Jeni lay.  Maria heard gunshots and "right away noticed that they had already shot [Jeni]."  One of the two men then shot Maria.

¶8     Sometime later, Maria realized she was still alive, but bleeding from the scalp.  She ran to a neighbor's house to get help and was later taken to a hospital, where she underwent surgery to remove a bullet from her head.  At the hospital, Detective Lopez showed Maria a photo lineup of six men.  Maria identified a photo of Robert Hernandez as "Bobby."

¶9     Peoria Police detectives found the bodies of Jeni, Omar, and Pablo at the house.  Omar's body had six stab wounds.  According to the medical examiner, these wounds were likely inflicted while Omar was still alive.  Police also found one copper-jacketed bullet and two lead-jacketed bullets in the room, suggesting two different weapons were used to kill Omar and Pablo.

¶10    Police later determined that Jeni and Martha Gonzalez co-leased the house where the murders occurred.  Martha was initially cooperative with the detectives and identified the "Bobby" described by Maria as Robert Hernandez.  She told Detective Lopez that Hernandez had a gun, knew where Jeni and Omar lived, and was upset because Sonia went to New Mexico with Jeni and had missed Angel's birthday party.  She also told Detective Lopez that Hernandez had called her at approximately 5:30 p.m. on the day of the murders to say "Omar and Jeni would not be bothering Sonia anymore."

## II.  ISSUES ON APPEAL

### A.  Denial of Requests for Change of Counsel

¶11    Hernandez asserts that the trial court did not sufficiently inquire into the bases for his three requests for new counsel and erred in denying the requests.  We review a trial court's ruling denying a change of counsel for an abuse of discretion.  *State v. Torres*, 208 Ariz. 340, 343 ¶ 9, 93 P.3d 1056, 1059 (2004).

¶12    As we recently stated in *State v. Gomez*, "[t]he Sixth Amendment guarantees criminal defendants the right to representation by counsel, but an indigent defendant is not entitled to counsel of choice, or to a meaningful relationship with his or her attorney."  231 Ariz. 219, 224 ¶ 19, 293 P.3d 495, 500 (2012) (quoting *Torres*, 208 Ariz. at 342 ¶ 6, 93 P.3d at

1058) (internal quotation marks omitted), *cert. denied*, 133 S. Ct. 2339 (2013). The trial court must appoint new counsel, however, if either "an irreconcilable conflict or a completely fractured relationship between counsel and the accused" exists. *State v. Cromwell*, 211 Ariz. 181, 186 ¶ 29, 119 P.3d 448, 453 (2005).

¶13 To preserve a defendant's Sixth Amendment right to counsel, the trial court has a "duty to inquire as to the basis of a defendant's request for substitution of counsel." *Torres*, 208 Ariz. at 343 ¶ 7, 93 P.3d at 1059. The court must make the inquiry on the record. *Id.* (citing *United States v. Morrison*, 946 F.2d 484, 499 (7th Cir. 1991)).

¶14 "The nature of the [court's] inquiry will depend upon the nature of the defendant's request." *Id.* ¶ 8. On the one hand, "generalized complaints about differences in strategy may not require a formal hearing or an evidentiary proceeding." *Id.* On the other hand, if the defendant sets forth "sufficiently specific, factually based allegations, . . . [the] court must conduct a hearing into his complaint." *Id.* (quoting *United States v. Lott*, 310 F.3d 1231, 1249 (10th Cir. 2002)) (internal quotation marks omitted).

¶15 If the trial court does conduct an inquiry, the defendant bears the burden of proving either a "complete breakdown in communication or an irreconcilable conflict." *Id.* at 342 ¶ 6, 93 P.3d at 1058. To satisfy this burden, the defendant must present evidence of a "severe and pervasive conflict with his attorney or evidence that he had such minimal contact with the attorney that meaningful communication was not possible." *Lott*, 310 F.3d at 1249. A colorable claim "must go beyond personality conflicts or disagreements with counsel over trial strategy." *Cromwell*, 211 Ariz. at 187 ¶ 30, 119 P.3d at 454. If a defendant meets this burden, the trial court "must grant the request for new counsel." *Torres*, 208 Ariz. at 343 ¶ 8, 93 P.3d at 1059.

### 1. Trial Court's Inquiry into Hernandez's Request for New Counsel

¶16 Hernandez argues that his allegations that defense counsel had only visited him at the jail four times in more than two years and had never spoken with him about his case were sufficiently specific to require a *Torres* hearing. Hernandez asserts that the trial court's inquiry was insufficient and asks this Court to remand for a more extensive evidentiary hearing on his claims. Although the trial court could have engaged in a more searching exploration of the responses from Hernandez's attorneys as to whether there were irreconcilable differences,

the court did not abuse its discretion because its inquiry was sufficient.

¶17    The record reflects that during the course of this case, Hernandez met and communicated with his attorneys several times.  For example, on December 10, 2008, Hernandez, his two attorneys, Rodrick Carter and Stephen Johnson, as well as his mitigation specialist, attended a mitigation status conference.  There, the court asked Hernandez:  "Do you have any questions of your defense team or -- are they keeping you pretty well advised of what is going on?"  Hernandez assented.  The court concluded that "it sounds like you have got a good working relationship with your defense team.  So continue to be cooperative with them."

¶18    On February 6, 2009, the court conducted another mitigation status conference attended by Hernandez, his two defense attorneys, and his mitigation specialist.  Hernandez again affirmed that his attorneys had been giving him progress reports.  Mr. Carter also communicated Hernandez's request to be tried by his "last day."  The court again concluded that "Defendant remains cooperative with his defense team."

¶19    Six months later on August 20, Hernandez filed a motion to withdraw counsel and appoint new counsel.  He alleged that his attorney had visited him only once "in approximately 15 months" and had never discussed his case.  Because of this "lack of communication," Hernandez claimed there was "no client and lawyer relationship."  The trial court did not rule on this motion, but six weeks later, on October 7, the court conducted a case management conference.  Hernandez and both of his attorneys were present.  Mr. Carter informed the court of Hernandez's decision to waive time by noting:  "I've discussed it with my client, he has agreed to waive time."  On July 21, 2010, the court conducted another case management conference with Hernandez and his counsel.  Mr. Carter advised the court that Hernandez "ha[d] indicated to [Carter] that he cannot see and needs glasses."

¶20    Two months later, on September 24, Hernandez filed a second motion for new counsel based on "irreconcilable differences" and "conflicts of interest."  Hernandez stated that he had filed a bar complaint and a civil lawsuit against Mr. Carter because "Mr. Carter has not gone over this case" and "refuses to allow [me] to have a part in [my] defense."

¶21    The trial court addressed Hernandez's motion on October 1, asking Hernandez and his counsel whether there were irreconcilable differences.  Mr. Carter denied any conflict with Hernandez and acknowledged that "Mr. Hernandez is frustrated with communication as far as him being able

to participate in his defense as far as the investigation goes and possible witnesses that he — that he may feel are important." Mr. Carter agreed to address those issues with Hernandez. Mr. Johnson, Hernandez's second chair counsel, echoed Mr. Carter's response.

¶22 The court then asked whether defense counsel felt that communication with Hernandez had broken down or irreconcilable differences, other than differences in strategy, had arisen. Mr. Carter said no, but agreed to speak with Hernandez about his strategic concerns.

¶23 The trial judge denied Hernandez's motion, finding no basis for removing counsel. The judge then explained the role of counsel in a criminal proceeding, as well as Hernandez's specific constitutional rights.

¶24 Hernandez responded:

Well, your Honor, I've been here for two years and four months. I've been visited by him four times, and I can tell you exactly why, and never once have I spoken to him about my case or anything in my case, not once, Your Honor.

. . . .

I've asked him to, if he could, come over so we can go over it and I could tell him some certain things that I know about, and it's never happened, Your Honor, and there's like -- my mother-in-law is a witness to this case that's really crucial to this, and just the other day they tried to interview her just barely Thursday or Wednesday it was, and Your Honor, we've got three weeks.

. . . .

And then I got a lot of other people too that they should have interviewed by now that haven't been interviewed.

¶25 Mr. Carter then addressed the visitation issue:

Mr. Hernandez has received visits from myself, Mr. Johnson and Maria Del La Rosa, my mitigation specialist. Mr. Hernandez has received his file when requested as far as the police reports, and I believe he received them early on. The visitation with Mr. Hernandez and in our investigation into this trial, Judge, is we will be ready for trial on the 18th as

scheduled.

Mr. Carter next spoke to Hernandez's concerns regarding witness interviews:

> With respect to the witnesses being interviewed, Martha Gonzalez I believe he's speaking about right now, she interviewed with the police, which we have a transcript of. She interviewed with codefendant's counsel, which we have a -- if we don't have a transcript, we definitely have the copy of the tape. She's also testified twice. We have statements from her in at least four different pretrial areas. We have statements from other witnesses that were either conducted by the police or previous defense counsel as well.

¶26 Following defense counsel's responses, the trial court explained that differences in trial strategy did not provide adequate grounds to disqualify counsel. The court denied Hernandez's motion, but ordered both lawyers and the mitigation specialist to meet to talk with Hernandez within the week.

¶27 Hernandez filed a third motion to change counsel a week later. He reasserted his claim of a lack of communication and emphasized that Mr. Carter "has yet to interview any witnesses," and has refused his requests to view "any and all evidence, police reports, [and] supplements in said police report."

¶28 On October 12, the trial court held a hearing to determine whether counsel had met with Hernandez and was ready to begin trial as scheduled. The trial judge asked, "Did you listen to everything he had to say that was of concern?" Mr. Carter responded, "yes." Hernandez protested:

> Like I was telling you, Judge, you know, the whole time I have been here, the first time I heard anything about my case was right here when he talked to me the first time. He didn't ask my opinion, any kind of strategy, anything. That's the first time he talked to [me] about it the whole time; two years, six months.

Hernandez also claimed that, in a discussion with Hernandez's wife, Mr. Carter did not recognize the names of Hernandez's co-defendants. The court denied Hernandez's motion, but ordered that the lawyers again meet with Hernandez at the jail.

¶29 Hernandez raised sufficiently specific factual allegations to warrant an inquiry. But the judge's inquiry fulfilled the requirements of *Torres*. The transcript of the court's inquiry on October 1 contains more than thirteen pages of discussion between the court, Hernandez, and his counsel, concerning Hernandez's motion for new counsel, including several specific questions addressed to Hernandez and his lawyers about whether there were "irreconcilable differences" or a "breakdown in communication." The court listened to Hernandez and ordered counsel to meet with Hernandez to address his concerns. The trial court sufficiently considered and addressed Hernandez's allegations.

¶30 Likewise, the court's second inquiry on October 12 confirmed that Hernandez had met with the lawyers as ordered. The court listened to and considered Hernandez's ongoing concerns and his attorneys' responses. The second inquiry was sufficient.

¶31 Nevertheless, we underscore the importance of conducting a *Torres* inquiry and establishing a thorough record for appeal. "In order to exercise its discretion properly the court must elicit from the defendant the reasons for his objection to counsel." *Torres*, 208 Ariz. at 343 ¶ 9, 93 P.3d at 1059 (quoting *United States v. Morris*, 714 F.2d 669, 673 (7th Cir. 1983)). Likewise, if the defendant makes specific allegations when requesting new counsel, the trial court should elicit specific on-the-record responses to the allegations from defense counsel.

### 2. Denial of Requests for New Counsel

¶32 Hernandez argues that even if the inquiry was sufficient, "the trial court erred in refusing to grant defendant's multiple requests for new counsel." We disagree.

¶33 Although Hernandez claims that his attorneys were ineffective in preparing for trial and did not communicate with him, at bottom his complaint is that his lawyers had not adequately consulted him regarding trial strategy and were not sufficiently familiar with his case. We have previously characterized similar complaints, when unsupported by the record, as disagreements over trial strategy. *See State v. Henry*, 189 Ariz. 542, 547, 944 P.2d 57, 62 (1997).[3] Such disagreements do not amount to

---

[3] Hernandez's arguments may be raised in a Rule 32 petition for post-conviction relief. *See Henry*, 189 Ariz. at 547, 944 P.2d at 62 ("Although tactical decisions may raise concerns about attorney

"irreconcilable differences" and are not alone a basis for new counsel. *Cromwell*, 211 Ariz. at 186–87 ¶¶ 29–30, 119 P.3d at 453–54.

¶34 Something less than irreconcilable conflict becomes merely "one factor for a [trial] court to consider" in determining whether to appoint new counsel. *Id.* at 186 ¶ 29, 119 P.3d at 453. A trial court should also evaluate (1) "whether new counsel would be confronted with the same conflict"; (2) "the timing of the motion"; (3) "inconvenience to witnesses"; (4) "the time period already elapsed between the alleged offense and trial"; (5) "the proclivity of the defendant to change counsel"; and (6) the "quality of counsel." *Id.* at 187 ¶ 31, 119 P.3d at 454 (quoting *State v. LaGrand*, 152 Ariz. 483, 486–87, 733 P.2d 1066, 1069–70 (1987)). Although the defendant's concerns must be evaluated and carefully considered, the trial court must also "balance the rights and interests of the defendant against the public interest in judicial economy, efficiency and fairness." *Id.*

¶35 Although the trial court did not explicitly refer to the aforementioned factors, the record indicates that the court considered them when assessing whether new counsel was warranted. The trial judge determined that there was neither an irreconcilable conflict nor a complete breakdown in communication that would require new counsel. The judge was aware that Hernandez had been in jail for two and a half years awaiting trial and that another continuance of the trial, which had a "firm" setting three weeks away, would certainly delay the case and inconvenience witnesses. The judge also examined the quality of counsel by questioning both attorneys about whether they were adequately prepared to go to trial and to competently represent their client.

¶36 Accordingly, the trial court sufficiently inquired into the bases for Hernandez's requests for new counsel and did not abuse its discretion in denying the requests.

## B. Impeachment Evidence Relating to Maria

¶37 Hernandez asserts that the trial court erred by twice refusing to permit him to impeach Maria, the surviving victim, with her prior inconsistent statements. We review a trial court's ruling regarding the scope of cross-examination for an abuse of discretion. *State v. Ellison*, 213 Ariz. 116, 132 ¶ 52, 140 P.3d 899, 915 (2006). Although Hernandez argues

competence, such matters are more properly analyzed in post-conviction relief proceedings.").

that he should have been allowed to impeach Maria's testimony with her prior inconsistent statements, the trial court did not err in precluding the questions absent an offer of proof of the prior statements. The lack of an offer of proof forecloses Hernandez's argument on appeal. *See* Ariz. R. Evid. 103(a)(2); *State v. Bay*, 150 Ariz. 112, 115, 722 P.2d 280, 283 (1986).

¶38     On direct examination, Maria testified several times that a man she did not know came out of the house toward the car. Although she did not know who this man was, Maria testified that she was able to clearly see a man, who was identified to her by Jeni as "Bobby," when she was forced from the vehicle into the house. Maria also testified that she did not look at Bobby's face once she was inside the home for fear of additional harm. She only "saw [the men's] feet coming and going."

¶39     On cross-examination, defense counsel sought to impeach Maria's testimony with statements purportedly made to Officer Rodriguez:

> Q.     Ms. Diaz, do you remember telling Officer Rodriguez when he asked you who did this, do you recall responding: There were two. I did not see them. One said do not look at us or we will kill you. Do you recall saying that?

The trial court sustained the prosecutor's objection to improper impeachment. Defense counsel did not make an offer of proof.

¶40     Defense counsel later attempted to impeach Maria by asking, "So you did not tell Officer Rodriguez that you did not see these people until you were inside the house?" The prosecution again objected to improper impeachment. The trial court sustained the objection, and defense counsel again did not make an offer of proof.

¶41     Prior inconsistent statements may be used to impeach the credibility of a witness, and such statements may be proven by extrinsic evidence. Ariz. R. Evid. 613(b)(2). "As a preliminary matter, however, the court must be persuaded that the statements are indeed inconsistent." *United States v. McLaughlin*, 663 F.2d 949, 952 (9th Cir. 1981) (quoting *United States v. Hale*, 422 U.S. 171, 176 (1975)); *see also* Ariz. R. Crim. P. 19.3 ("No prior statement of a witness may be admitted for the purpose of impeachment unless it varies materially from the witness' testimony at trial.").

¶42     A party can claim the exclusion of evidence is error only if the exclusion affects the party's substantial rights and the party makes an offer of proof. Ariz. R. Evid. 103(a)(2). An offer of proof is critical because

it permits "the trial judge to reevaluate his decision in light of the actual evidence to be offered, . . . and to permit the reviewing court to determine if the exclusion affected the substantial rights of the party offering it." *Fortunato v. Ford Motor Co.*, 464 F.2d 962, 967 (2d Cir. 1972). Because defense counsel did not make an offer of proof as to how Maria's purported pre-trial statements to Officer Rodriguez were inconsistent with her testimony, neither the trial court, nor this Court, can assess whether Maria's pretrial statements varied materially from her in-court testimony.

¶43     An offer of proof is not required if "it is obvious what the answer of the witness will be or what the proof will be," *State v. Belcher*, 109 Ariz. 551, 553, 514 P.2d 472, 474 (1973), or the relevancy and materiality of the excluded evidence is apparent, *State v. Kaiser*, 109 Ariz. 244, 247, 508 P.2d 74, 77 (1973). In this case, it is not obvious what the relevance of the first impeachment attempt was because Maria's direct testimony does not notably conflict with her purported statements to Officer Rodriguez. Her alleged statements to Officer Rodriguez, — "There were two. I didn't see them. One said do not look at us or we will kill you." — correspond to Maria's direct testimony as she explained that she saw Hernandez while she was *outside* the home, but once *inside*, she did not look at Hernandez again for fear of additional harm. An offer of proof would have provided the trial court, and this Court, with the basis to discern any inconsistency.

¶44     The second impeachment attempt poses similar problems. Defense counsel was ostensibly asserting that Maria told Officer Rodriguez that she did not see "Bobby" and his accomplice until she was inside the house, as opposed to her direct testimony where she stated that she saw "Bobby" walk toward her and Jeni in the car outside. But defense counsel's cross-examination attempted to impeach Maria's purported statements to Officer Rodriguez in two different ways. First, defense counsel asked whether Maria told Officer Rodriguez "There were two. *I did not see them.* One said do not look at us or we will kill you." Then, just nine questions later, defense counsel asked whether Maria told Officer Rodriguez that she "did not see these people *until* you were inside the house." Again, without an offer of proof, we cannot know what Maria told Officer Rodriguez or whether it was inconsistent with her trial testimony. Because the substance of the alleged prior inconsistent statement is not readily apparent, the absence of an offer of proof renders us unable to evaluate the trial court's ruling and precludes Hernandez's argument on appeal. Accordingly, we cannot say the trial court abused its discretion.

## C. Impeachment Evidence to Substantively Prove Guilt

¶45     Hernandez next argues that the court should not have allowed the State to present evidence impeaching Martha Gonzalez as substantive evidence of Hernandez's guilt.  Because Hernandez did not object at trial, we review for fundamental error.  *State v. Henderson*, 210 Ariz. 561, 567 ¶ 19, 115 P.3d 601, 607 (2005).  To obtain relief under that standard of review, Hernandez "must first prove error."  *Id.* at 568 ¶ 23, 115 P.3d at 608.  We find none.

¶46     At trial, Martha was evasive when the State asked whether she talked with Hernandez on the day of the murders.  She initially denied speaking with Hernandez, but then admitted she had done so after the State asked if she remembered telling Detective Lopez that she spoke with Hernandez that day.  The State then asked if she remembered telling Detective Lopez that Hernandez told her that "Omar and Jeni weren't going to be bothering Sonia anymore."  Martha did not remember making such a statement.  In rebuttal, the State recalled Detective Lopez, who testified that Martha had told him that she had "several phone conversations with Bobby the day of the murders" and Martha heard Hernandez tell her that "Omar and Jeni weren't going to be bothering Sonia anymore."  According to Hernandez, Martha's prior inconsistent statement should not have been used substantively as the admission significantly contributed to his conviction.  Although we agree that the statement likely contributed to Hernandez's conviction, the trial court did not err in admitting the statement.

¶47     A prior inconsistent statement[4] by a witness subject to cross-examination is not hearsay.  Ariz. R. Evid. 801(d)(1)(A).  Prior inconsistent statements can be used substantively and to impeach.  *See, e.g.*, *State v. Skinner*, 110 Ariz. 135, 142, 515 P.2d 880, 887 (1973).

¶48     But substantive use of a prior inconsistent statement is not limitless.  A prior inconsistent statement admissible under Rule 801(d)(1)(A) can be excluded under Arizona Rule of Evidence 403 if it creates a danger of unfair prejudice.  *State v. Allred*, 134 Ariz. 274, 278, 655 P.2d 1326, 1330 (1982).  *Allred* enumerated five factors to consider when assessing whether Rule 403 should bar admission of a prior inconsistent statement for

---

[4]     "A claimed inability to recall, when disbelieved by the trial judge, may be viewed as inconsistent with previous statements."  *State v. Hausner*, 230 Ariz. 60, 76 ¶ 58, 280 P.3d 604, 620 (2012).  Hernandez does not dispute that Martha's testimony was inconsistent.

substantive purposes:

1. the witness being impeached denies making the impeaching statement, and
2. the witness presenting the impeaching statement has an interest in the proceeding and there is no other corroboration that the statement was made, or
3. there are other factors affecting the reliability of the impeaching witness, such as age or mental capacity, . . .
4. the true purpose of the offer is substantive use of the statement rather than impeachment of the witness,
5. the impeachment testimony is the only evidence of guilt.

*Id.* at 277, 655 P.2d at 1329 (alteration in original). Although these five *Allred* factors are instructive, they are not exhaustive. *Id.* Rather, assessing the danger of unfair prejudice requires a fact-specific examination into the nature of the prior inconsistent statement and the reason for its substantive use. *State v. Sucharew*, 205 Ariz. 16, 23 ¶ 20, 66 P.3d 59, 66 (App. 2003).

¶49 Only the fourth factor weighs against the admission of impeaching testimony because the State wanted to elicit Hernandez's statement — that Omar and Jeni weren't going to be bothering Sonia anymore — for its substance, rather than to impeach Martha's credibility. But this is outweighed by the first, second, third, and fifth *Allred* factors favoring admission. The trial court could well have found that the possibility of unfair prejudice did not outweigh the probative value of the testimony. The court did not err, let alone fundamentally err, in admitting this evidence.

## D. Evidence of Premeditation

¶50 Hernandez argues that the State presented insufficient evidence of premeditation. He posits that if a "defendant is an accomplice to an offense other than murder (i.e., kidnapping) and the principal commits a premeditated homicide, that accomplice liability does not extend to or is not imputed to the defendant." We review the record to resolve "whether substantial evidence supports the jury's [premeditation] finding, viewing the facts in the light most favorable to sustaining the jury verdict." *State v. Roque*, 213 Ariz. 193, 218 ¶ 93, 141 P.3d 368, 393 (2006). Substantial evidence is "proof that reasonable persons could accept as adequate and

sufficient to support a conclusion of [the] defendant's guilt beyond a reasonable doubt." *Id.* (quoting *State v. Roseberry*, 210 Ariz. 360, 369 ¶ 45, 111 P.3d 402, 411 (2005)) (internal quotation marks omitted).

¶51 For premeditated murder, the State must show substantial evidence that the defendant, "intending or knowing that the person's conduct will cause death, . . . causes the death of another with premeditation." A.R.S. § 13–1105(A)(1). "To prove premeditation, the state must show that a defendant intended to kill another person, and after forming that intent[,] . . . reflected on the decision before killing." *State v. VanWinkle*, 230 Ariz. 387, 391–92 ¶ 15, 285 P.3d 308, 312–13 (2012) (quoting *State v. Thompson*, 204 Ariz. 471, 479 ¶ 32, 65 P.3d 420, 428 (2003)) (internal quotation marks omitted), *cert. denied*, 133 S. Ct. 909 (2013).

¶52 A defendant can be guilty of premeditated murder as an accomplice if he intended to facilitate or aid in committing the murder. *Ellison*, 213 Ariz. at 134 ¶ 67, 140 P.3d at 917. In *Ellison*, evidence that the defendant knew the victims, planned the invasion, and did not attempt to conceal his identity was sufficient to permit the fact finder to infer that Ellison intentionally aided or assisted in the killing, or even committed the murder himself. *Id.* ¶ 70.

¶53 As in *Ellison*, the jury could have found that Hernandez acted as an accomplice, intending to aid in committing the murder. Hernandez knew the victims. He planned an invasion of their home. He did not attempt to conceal his identity from them. Although Hernandez argues that no forensic evidence tied him to the scene, premeditation can, of course, be proved by circumstantial evidence and was adequately proven here. *See State v. Nelson*, 229 Ariz. 180, 185 ¶ 16, 273 P.3d 632, 637 (2012), *cert. denied*, 133 S. Ct. 131 (2012).

### E. Unanimous *Enmund-Tison* Finding

¶54 Although Hernandez argues that the jury was required to make a unanimous *Enmund-Tison* finding, Hernandez concedes, and we agree, that upholding the premeditation finding renders the *Enmund-Tison* issue moot as *Enmund-Tison* only applies to felony murder. *See State v. Dann*, 220 Ariz. 351, 366 ¶ 73, 207 P.3d 604, 619 (2009) (requiring no further *Enmund-Tison* finding after a premeditated murder verdict).

### F. Evidence of Especial Cruelty for the Murder of Jeni

¶55 Hernandez argues that the State failed to present sufficient evidence that Jeni's murder was "especially cruel." We review the entire

murder transaction to determine whether substantial evidence supports the jury's finding of the (F)(6) "especially cruel" aggravating factor. *State v. Gallardo*, 225 Ariz. 560, 565 ¶ 15, 242 P.3d 159, 164 (2010).

**¶56**    To show a murder was especially cruel under A.R.S. § 13-751(F)(6), the State must prove beyond a reasonable doubt that the defendant intended or anticipated that the victim suffer either physical pain or mental distress. *Ellison*, 213 Ariz. at 141–42 ¶ 119, 140 P.3d at 924–25. Mental distress is established if the victim either "experienced significant uncertainty as to her ultimate fate . . . or if the victim was aware of a loved one's suffering." *Id.* at 142 ¶ 120, 140 P.3d at 925 (internal citations omitted). Here, both types of mental distress are present.

### 1.  Uncertainty as to One's Fate

**¶57**    Hernandez's incorrectly asserts that "there is no indication in the Record that Jeni suffered." Hernandez used a pistol to force Jeni (and Maria) into the house, where they heard Omar and Pablo screaming and pleading not to be harmed. *See State v. McCall*, 139 Ariz. 147, 161, 677 P.2d 920, 934 (1983) (finding the victims suffered uncertainty as to their ultimate fate, and thus mental anguish, where defendants herded victims throughout their home at gunpoint). Hernandez bound Jeni's hands behind her back. *See State v. Lynch*, 225 Ariz. 27, 41 ¶ 79, 234 P.3d 595, 609 (2010) (finding mental anguish when conscious victim was bound to chair). While bound, Jeni would have been uncertain as to her fate, *see State v. Bible*, 175 Ariz. 549, 605, 858 P.2d 1152, 1208 (1993), and thus suffered the requisite mental anguish necessary for the "especially cruel" finding required by § 13-751(F)(6).

### 2.  Aware of a Loved One's Suffering

**¶58**    Mental distress can also be found when the victim is aware of a loved one's suffering. *Ellison*, 213 Ariz. at 142 ¶ 120, 140 P.3d at 925; *see also McCall*, 139 Ariz. at 161, 677 P.2d at 934.

**¶59**    Hernandez argues the State did not prove mental distress because Jeni was already dead before the others, and thus she was not "forced to listen as [her] loved ones were shot one at a time." But contrary evidence was presented at trial.

**¶60**    Although Maria testified, "I heard shots in the other room, and right away I noticed that they had already shot my friend, [Jeni]," she also testified at length about hearing Omar and Pablo crying in Jeni's bedroom as she and Jeni walked toward another room in the house. According to

Maria, both Omar and Pablo "were asking [Hernandez and his accomplice] not to hurt them or the family, and each time they were screaming louder and stronger." Maria, and presumably Jeni, also heard a strange sound coming from Jeni's room that "led [her] to think that it was something that they were giving electric shocks," followed by more cries from Omar and Pablo. Because Jeni was alive to hear Omar's and Pablo's pleas, it is immaterial whether she was the first victim killed. Jeni heard her loved ones' pleas and endured mental distress because she was aware of their suffering.

¶61 In sum, substantial evidence supporting the jury's (F)(6) cruelty finding that Jeni suffered mental anguish, both from the uncertainty as to her fate and her awareness of Omar's and Pablo's suffering.

## III. ABUSE OF DISCRETION REVIEW

¶62 Because Hernandez murdered Omar, Pablo, and Jeni after August 1, 2002, we review Hernandez's death sentences only "to determine whether the trier of fact abused its discretion in finding aggravating circumstances and imposing a sentence of death." A.R.S. § 13-756(A). A finding of aggravating circumstances or the imposition of a death sentence "is not an abuse of discretion if there is 'any reasonable evidence in the record to sustain it.'" *State v. Manuel*, 229 Ariz. 1, 9 ¶ 42, 270 P.3d 828, 836 (2011) (quoting *State v. Morris*, 215 Ariz. 324, 341 ¶ 77, 160 P.3d 203, 220 (2007)).

### A. Aggravating Circumstances

¶63 For each murder the jury found four aggravating factors: Hernandez had been previously convicted of a serious offense, A.R.S. § 13-751(F)(2); he committed the crime in an especially cruel manner, *id.* § 13-751(F)(6); he committed the offense while on authorized release from the state department of corrections, *id.* § 13-751(F)(7)(a); and he was convicted of one or more other murders that were committed during the commission of the offense, *id.* § 13-751(F)(8).

¶64 Hernandez does not dispute the jury's finding of the (F)(8) aggravating circumstance, and the record fully supports that finding. For the reasons set forth above, *see supra* ¶¶ 55–61, the jury's finding of the (F)(6) cruelty aggravator for the murder of Jeni is supported by substantial evidence. The jury's (F)(6) finding for the deaths of Omar and Pablo is also supported by substantial evidence.

### 1. (F)(2) Aggravator

**¶65**    Hernandez argues that his prior conviction for robbery/burglary, which supported the jury's (F)(2) finding, was a "non-violent offense" and thus did not satisfy (F)(2)'s requirement of a "serious offense."  That argument misses the mark because a serious offense need not be a violent offense to support a finding of the (F)(2) aggravator.  *See* A.R.S. § 13-751(F)(2).

**¶66**    Before 1993, the (F)(2) aggravator applied when a "defendant was previously convicted of a felony in the United States involving the use or threat of violence on another person."  *State v. McKinney*, 185 Ariz. 567, 580 n.4, 917 P.2d 1214, 1227 n.4 (1996).  The current version of the (F)(2) aggravating circumstance, however, removed ambiguities created by "the prior version's more vague reference to crimes involving 'violence.'"  *State v. Martinez*, 196 Ariz. 451, 461 ¶ 41, 999 P.2d 795, 805 (2000).  By substituting "serious offense," the legislature intended to broaden the scope of the (F)(2) aggravator to encompass prior serious convictions not solely limited to crimes of violence.

**¶67**    Armed robbery/burglary is a "serious offense" for purposes of § 13-751(F)(2).  *See* A.R.S. § 13-751(J)(8)–(9); *State v. Johnson*, 212 Ariz. 425, 438 ¶ 50, 133 P.3d 735, 748 (2006) ("A serious offense includes armed robbery.").  The jury did not abuse its discretion by finding the (F)(2) aggravator.

### 2. (F)(7)(a) Aggravator

**¶68**    Hernandez also contends that the (F)(7)(a) aggravator should not apply because it "just means [that the] defendant was a recidivist, which constitutes the majority of non-capital felons."  But this Court rejected this argument in *State v. Gretzler*, 135 Ariz. 42, 57 n.2, 659 P.2d 1, 16 n.2 (1983).  The State introduced uncontroverted evidence that Hernandez was on authorized release from prison at the time of the offense.  The jury did not abuse its discretion in finding the (F)(7)(a) aggravator.

## B. Mitigating Circumstances

**¶69**    A defendant may present any information relevant to any mitigation during the penalty phase, but has the burden to prove any mitigating circumstance by a preponderance of evidence.  *See* A.R.S. § 13-751(C).

**¶70**    Hernandez presented evidence that he suffered from "traumatic

brain injury" rendering him less able to control aggressive impulses. But the State countered with expert testimony that Hernandez's experts utilized outdated methodology in their brain imaging, and that even though Hernandez may suffer from antisocial personality disorder, the disorder did not affect his ability to control his actions.

¶71 In his allocution, Hernandez discussed his difficult childhood and a family history burdened by limited resources, alcohol, and abuse. Nevertheless, a juror could afford little mitigating weight to Hernandez's childhood because he was thirty-two years old when he killed Omar, Pablo, and Jeni. *See Nelson*, 229 Ariz. at 191 ¶ 53, 273 P.3d at 643 (finding the childhood mitigating factor of little consequence because the defendant was thirty-five at the time of the murder).

¶72 Hernandez also explained his motive for the murders, some criminal history, as well as his religious experiences and conversion. Although these may constitute non-statutory mitigating circumstances, *see State v. Gallegos*, 178 Ariz. 1, 19, 870 P.2d 1097, 1115 (1994), each juror has discretion to determine how much mitigating weight to give them, *Nelson*, 229 Ariz. at 191 ¶ 54, 273 P.3d at 643.

¶73 The jury found four aggravators for each of the three murders — including an aggravator for multiple murders. Even if we assume that Hernandez sufficiently proved his alleged mitigating circumstances, we cannot say the jury abused its discretion by determining that the mitigation was not "sufficiently substantial to call for leniency" under A.R.S. § 13-751(E).

## IV. CONCLUSION

¶74 We affirm Hernandez's convictions and sentences.[5]

---

[5] Hernandez also lists eighteen constitutional claims, along with prior decisions he identifies as rejecting them, which he states he seeks to preserve for federal review. We decline to revisit these claims.