968 P.2d 578

STATE of Arizona, Appellee,

v.

Robert J. MOODY, Appellant.

No. CR–96–0191–AP.

Supreme Court of Arizona.

Nov. 12, 1998.

Grant Woods, Attorney General By Paul J. McMurdie, Chief Counsel, Criminal Appeals Section, Consuelo M. Ohanesian, Assistant Attorney General, Phoenix, Attorneys for Appellee State of Arizona.

Susan A. Kettlewell; Pima County Public Defender By Frank P. Leto, Deputy Public Defender, Tucson, Attorneys for Appellant Robert J. Moody.

## OPINION

ZLAKET, Chief Justice.

¶1 Defendant Robert J. Moody was convicted on two counts of first degree murder and sentenced to death. We review this case on direct, automatic appeal pursuant to Ariz.

Const. art. VI, § 5(3), A.R.S. § 13–4031, and Ariz. R.Crim. P. 31.2(b).

## FACTS

¶ 2 On November 15, 1993, the defendant awoke, put on his "best suit," picked up some flowers, and drove to the home of a female friend, Michelle Malone. Seeing her husband's car in the driveway, the defendant went to have breakfast. He later returned, parked his car, went to the front door, and knocked. After first checking to see who it was, Malone let the defendant into her house.

¶ 3 Moody gave her the flowers, then sat and talked with her at the kitchen table. She showed him around her newly decorated house. When they returned to the kitchen, the defendant pulled a knife out of his jacket pocket. The two struggled, moving from the kitchen through the hallway to the bedroom, and eventually to the office, where he emptied Malone's purse and took money from her wallet. Moody then forced her back into the kitchen and tied her to a chair with phone cords he had ripped from the wall. He dragged her—still tied to the chair—into a back bedroom, where he removed two gun cases from a closet. Defendant hit Malone over the head with a BB gun and shot her numerous times in the head and chest with a .22 rifle, reloading between each shot. He then left, taking the rifle, a shotgun, and a .22 pistol with him.

¶ 4 Five days later, on the evening of November 20, 1993, Moody packed a suitcase and went to the home of another friend, Patricia Magda. After visiting for a while, Magda showed Moody a Christmas calendar she had made. When she bent down on her knees, he grabbed her around the neck and tied her hands and feet with neckties that he had in his jacket pocket. He took a bank card from her purse and forced her to reveal the personal identification number (PIN). Next, the defendant put a chair over the victim and drove her car to an automatic teller machine (ATM). He was unable to get any money, so he drove back to Magda's house, where she again gave him her PIN. He then went to the ATM and withdrew $300. Moody returned to the victim's house, pulled a knife from his pocket, slit her throat, stabbed her in the back, covered her with a rug, and beat her over the head with hedge clippers. He cut the telephone cords, took Magda's wallet and keys, and left in her car.

¶ 5 Defendant claims that his involvement in these crimes was involuntary. He says that space aliens were in control of his body, and he was merely an unconscious observer of the murders.

## PROCEDURAL HISTORY

¶ 6 On January 5, 1994, Moody showed up in California at the Orange County sheriff's department, claiming not to know his identity or to remember anything prior to January 4, 1994, when he found himself on a bus bench. Police discovered through fingerprint records that he was wanted in Arizona on two counts of first degree murder.

¶ 7 Upon the defendant's return to this state, deputy public defender Daniel Grills was appointed as his counsel. In May of 1994, Grills moved to withdraw, alleging that Moody had "developed an obsessive hatred for his attorney and his attorney's staff" and a belief "that his attorney [was] totally incapable of providing him with even minimally competent representation." Grills further claimed that he had "exhausted all efforts to reconcile the conflict and [had] reached a firm decision that the situation [was] irreparable." The court perceived that Moody's disagreement was with Grills' refusal to present or investigate his so-called "alien defense," rather than with the lawyer personally. Although the judge stated his opinion that this conflict would likely be present with any attorney appointed for the defendant, we are unable to find in the record any formal ruling on the motion to withdraw. Because Grills continued with the representation, we assume it was denied.

¶ 8 On June 21, 1995, Grills filed a second motion to withdraw, stating that Moody had demanded his removal. Apparently, the defendant threatened to file ethical complaints against both Grills and the Public Defender's office if he did not obtain new counsel. Defendant expressed frustration at the attorney's failure to interview any witnesses. He also stated that he had no trust in Grills and no confidence that the lawyer would act in

his best interest. When the judge denied this motion, the defendant indicated that he would file a request to proceed pro se because of the court's refusal to appoint new counsel.

¶ 9 On July 5, 1995, Moody filed his motion for self-representation claiming, among other things, that Grills "wilfully neglected" to interview any of the state's or the defendant's witnesses and that "the trust essential to effective attorney client relationship has been completely destroyed." He stated that he was being forced to accept the lawyer against his will. Ironically, Grills opposed the motion, believing that any waiver was coercive under the circumstances. The court, however, granted the defendant's request, and Moody represented himself at trial. Grills was appointed as advisory counsel, but was later replaced by another public defender, John Seamon. Moody was convicted on both counts of first degree murder and sentenced to death.

¶ 10 Defendant raises numerous issues on appeal. We reverse the conviction and remand for a new trial because the court's refusal to appoint a new attorney rendered the subsequent waiver of counsel involuntary. We need not reach any of the other issues.

## NEW COUNSEL

¶ 11 A criminal defendant has a Sixth Amendment right to representation by competent counsel. U.S. Const. amend. VI; *see also* Ariz. Const. art. II, § 24; A.R.S. § 13–114(2); Ariz. R.Crim. P. 6.1. A defendant is not, however, entitled to counsel of choice, or to a meaningful relationship with his or her attorney. *State v. Bible,* 175 Ariz. 549, 591, 858 P.2d 1152, 1194 (1993). Consequently, when considering a motion to substitute attorneys, a judge must evaluate several factors designed to balance the rights and interests of a defendant with judicial economy. These include

whether an irreconcilable conflict exists between counsel and the accused, and whether new counsel would be confronted with the same conflict; the timing of the motion; inconvenience to witnesses; the time period already elapsed between the alleged offense and trial; the proclivity of the defendant to change counsel; and quality of counsel.

*State v. LaGrand,* 152 Ariz. 483, 486–87, 733 P.2d 1066, 1069–70 (1987). The trial court's decision will not be disturbed absent a clear abuse of discretion. *State v. Lee,* 142 Ariz. 210, 220, 689 P.2d 153, 163 (1984) (quoting *People v. Schultheis,* 638 P.2d 8, 15 (Colo. 1981)).

## IRRECONCILABLE CONFLICT

¶ 12 The defense argues that a genuine irreconcilable conflict existed between Moody and his attorney, requiring a change of counsel. *See State v. Henry,* 189 Ariz. 542, 547, 944 P.2d 57, 62 (1997). The state, on the other hand, contends that the friction between the defendant and his lawyer was merely a disagreement over trial strategy, insufficient to justify new representation. *See State v. Castillo,* 110 N.M. 54, 56, 791 P.2d 808, 810 (N.M.Ct.App.1990).

¶ 13 The record in this case is replete with examples of a deep and irreconcilable conflict. Defendant's confidence in his attorney was shaken at the outset, when an officer at the jail allegedly told him that if Grills was his attorney, he might as well plead guilty because that lawyer "keeps his files in his shirt pocket." In addition, the defendant's assertions that he had been abducted by "space aliens" caused Grills to get angry with him and call him "crazy," both to his face and to the press.

¶ 14 When Grills disclosed 117 witnesses, the prosecutor moved for sanctions against him, claiming bad faith. The list of witnesses included former United States presidents and astronomer Carl Sagan. Grills provided address and telephone information for only five of the persons on the list, and some were identified by first name only. The disclosure statement also specified a defense (duress) unavailable in first degree murder cases. *See* A.R.S. § 13–412.

¶ 15 Grills' response to the prosecutor's motion described the difficulties he was having with the defendant. He claimed that Moody had insisted on the contents of the disclosure statement, and that it was filed in an effort to regain his client's confidence by "'playing ball' as the Defendant would like it played." Despite this explanation, the court found the disclosures "fraudulent" and ordered a good faith supplemental pleading within two weeks.

¶ 16   The strained relationship between lawyer and client continued.  Defendant accused Grills and the lead public defender of being incompetent and crazy.  He believed that the lawyers were conspiring with the prosecutor, court, and doctor to have him declared insane.  Grills admitted yelling at his client, telling him that he did not care about his case, and threatening to quit if the defendant called the press.  According to Grills, Moody developed an "obsessive hatred" for him and the public defender's office.  Moody believed they were incapable of providing him with minimally competent representation.  Grills stated that he and the defendant were "almost at blows" and were "antagonistic towards each other."

¶ 17   When Moody was found incompetent to stand trial, Grills allegedly had a party to celebrate.  The conflict worsened after Moody was restored to competence.  He continued to believe that his lawyer was ineffective.  The witnesses had yet to be interviewed, and according to the defendant, the attorney refused to meet with him.  Meanwhile, Grills complained that his caseload was preventing him from preparing adequately for Moody's trial.

¶ 18   The lawyer's second motion to withdraw came after the defendant threatened to file ethical complaints against him and the public defender's office.  Grills told the court, "it would be the happiest day in my life if you took me off the case."  Shortly thereafter, he moved to continue the trial, claiming he was unprepared and exhausted due to his "unfair and oppressive trial schedule."

¶ 19   Admittedly, part of the conflict between Grills and Moody stemmed from the latter's insistence on the "alien defense theory," his lawyer's reluctance to espouse it, and the trial judge's refusal to allow witnesses in support of it.  While this conflict might be present regardless of who represented Moody, new counsel "may [have been] more successful at persuading the client to follow a different course of action," *State v. Lee,* 142 Ariz. at 220, 689 P.2d at 163, and perhaps even to accept an insanity defense.

¶ 20   Grills repeatedly informed the trial court that he believed his client would cooperate with a different attorney.  During the hearing on the first motion to withdraw, he pleaded with the trial judge:

> I've addressed personally my issue of this is a problem that he's not going to have with any other attorney.

\* \* \*

> Otherwise, I would have tried to weather the storm, Your Honor, and I've tried from day one.  I just got off to a bad start.  You'll recall the problem at the jail with the guards attacking, allegedly attacking my ability as an attorney way back in the proceedings.  It's just degraded ever since then.

> I've made every effort, Your Honor.  I made Mr. Moody aware countless times if there is a substitution that occurs, that's the last one, the last bite he gets at the apple.  I think that alone will create incentive.

> But quite frankly, not to oversimplify it, just not have the name Public Defender after it.  I know the people that are on the contract list and I can't think of a one that wouldn't be able to get along better with him than me.

At another hearing on the same motion he said:

> Your Honor, he is totally focused on me 100 percent.  Interesting aside, part of his thinking is that ... the next lawyer is predestined and he's not going to have any problems with him.  I have told him—this has been going on since day one, Your Honor, and I have in effect threatened him, saying, you know, if you get another lawyer, that's going to be it.  You don't get any more.  But if there is a thousand lawyers in Pima County, 999 will get along better with him than me.

¶ 21   This case is unlike *State v. Henry,* in which the defendant "repeatedly claimed 'irreconcilable conflict' with a series of attorneys," and the trial judge had already granted two motions to substitute counsel.  189 Ariz. at 547, 944 P.2d at 62.  Here, there is no evidence of a proclivity to change lawyers.  *See LaGrand,* 152 Ariz. at 486, 733 P.2d at 1069.  The court refused to allow a substitution even once, thus we have no basis for believing that this defendant would have re-

peatedly requested a change. Indeed, once Grills was replaced by Seamon as advisory counsel, there were no further complaints by the attorney or Moody regarding the relationship.

## WAIVER OF COUNSEL

¶ 22 An accused has a right under both the federal and state constitutions to waive counsel and represent himself. U.S. Const. amends. VI, XIV; Ariz. Const. art. II, § 24. Such a waiver, however, must be knowing, intelligent, and voluntary. *State v. Cornell,* 179 Ariz. 314, 322, 878 P.2d 1352, 1360 (1994). Waiver is voluntary if the choice presented to the defendant is not constitutionally offensive. In other words, the options must be consistent with the protections of the Sixth Amendment. *United States v. Robinson,* 913 F.2d 712, 715 (9th Cir.1990) (citing *United States v. Moya–Gomez,* 860 F.2d 706, 739 (7th Cir.1988)).

¶ 23 Here, the choices presented to Moody were either representation by a lawyer with whom he had a completely fractured relationship, clearly an "irreconcilable conflict," or self-representation. By refusing to appoint new counsel, the trial court effectively left him no alternative. Forcing Moody to choose in this situation was constitutionally impermissible because both alternatives resulted in a violation of his right to representation. We hold that the court's refusal to provide another attorney was an abuse of discretion and rendered Moody's waiver involuntary. Because the deprivation of a defendant's Sixth Amendment right to counsel "infect[s] the entire trial process," it requires automatic reversal. *Bland v. California Dep't of Corrections,* 20 F.3d 1469, 1478 (9th Cir.1994); *see United States v. Taylor,* 113 F.3d 1136, 1144 (10th Cir.1997).

## DISPOSITION

¶ 24 We reverse the defendant's convictions and sentences. The matter is remanded for a new trial.

JONES, Vice Chief Justice, FELDMAN, Justice, and McGREGOR, Justice, concur.

MARTONE, Justice, concurring.

¶ 25 There is considerable evidence in this case that Moody wanted to represent himself because of his erroneous belief that this was a way to present his space alien theory of defense. He claimed the space aliens made him do it. He did not plead insanity. The trial court was quite correct in rejecting this defense as a matter of law and thus no lawyer would ever be able to present it. Nor could a pro per litigant. *United States v. Moreno,* 102 F.3d 994, 998–99 (9th Cir.1996) (holding constitutional right to testify does not authorize a defendant to present testimony that is irrelevant as a matter of law). *See Rock v. Arkansas,* 483 U.S. 44, 55, 107 S.Ct. 2704, 2711, 97 L.Ed.2d 37 (1987) (stating the right to present *relevant* testimony is not without limitation).

¶ 26 If, upon remand, another irreconcilable conflict develops as a result of Moody's insistence upon the assertion of his space alien theory, then Moody will have to choose between his lawyer or self-representation, and in neither case will he be able to present his space alien defense. The trial court must make this point very clear to Moody.