NOTICE: NOT FOR OFFICIAL PUBLICATION.
UNDER ARIZONA RULE OF THE SUPREME COURT 111(c), THIS DECISION IS NOT PRECEDENTIAL
AND MAY BE CITED ONLY AS AUTHORIZED BY RULE.

IN THE

# ARIZONA COURT OF APPEALS
### DIVISION ONE

---

STATE OF ARIZONA, *Appellee,*

*v.*

BENJAMIN CLARK DANN, *Appellant.*

No. 1 CA-CR 21-0191
FILED 6-21-2022

---

Appeal from the Superior Court in Mohave County
Nos. S8015CR201301102
S8015CR201301127
S8015CR202000065
The Honorable Derek C. Carlisle, Judge

**AFFIRMED**

---

COUNSEL

Arizona Attorney General's Office, Tucson
By Amy Pignatella Cain
*Counsel for Appellee*

Mohave County Legal Advocate's Office, Kingman
By Jill L. Evans
*Counsel for Appellant*

---

**MEMORANDUM DECISION**

Presiding Judge Jennifer B. Campbell delivered the decision of the Court, in which Judge Randall M. Howe and Judge James B. Morse Jr. joined.

---

**C A M P B E L L**, Judge:

¶1        Benjamin Dann appeals his conviction and sentence for first-degree murder. For the following reasons, we affirm.

### BACKGROUND[1]

¶2        Responding to a report of a "possible deceased subject" lying in the desert, law enforcement officers located and recovered a body. Given its substantial decomposition, the medical examiner performing the autopsy concluded that the victim died at least a week before being discovered. The medical examiner also determined that the victim died as a result of "multiple blunt force injuries," having been repeatedly struck with an oval-shaped metal object causing skull fractures, cheekbone fractures, and jawbone fractures.

¶3        The police used a database to identify the victim through his tattoos, and they then notified the victim's family of his death and that law enforcement suspected foul play. The officers did not disclose the manner of the victim's death, however, believing that withholding the information may prove useful in determining which individuals had actual knowledge of the victim's murder.

¶4        Approximately a week after the victim's body was discovered, Dann contacted the police, seeking "to clear his name." During his initial interview with law enforcement officers, Dann denied any involvement with the victim's death and named several other people who may have wanted to kill him.

¶5        On the heels of the Dann interview, a detective interviewed a teenager (the minor witness) who reportedly had some information about the victim's death. The minor witness knew both the victim and Dann, as well as Dann's friend, Alfred Talavera. She recounted an evening a few

---

[1]        We view the facts in the light most favorable to sustaining the verdict. *State v. Payne*, 233 Ariz. 484, 509, ¶ 93 (2013).

weeks before the victim's body was discovered —when Dann and Talavera drove up to her mother's house in a green truck and Dann asked for permission to wash his hands. He was allowed to wash his hands at an outside hose, and the minor witness accompanied him, holding a flashlight. Although it was dark, the flashlight illuminated Dann's hands, and the minor witness saw him wash off "a dark substance" that "looked like blood." The minor witness also reported that Dann told her that he and Talavera had seen the victim walking that evening and offered him a ride. Dann stated that after the victim got inside the green truck, he and Talavera bludgeoned the victim to death with a hammer and then disposed of the weapon in Talavera's mother's burn pit.

¶6        Given the minor witness's description of a murder weapon consistent with the undisclosed autopsy results, the detective focused on Dann and Talavera as likely suspects. Law enforcement officers drafted a search warrant predicated on the information relayed by the minor witness, encompassing the minor witness's mother's home, Talavera's mother's green truck, and Talavera's mother's house.

¶7        After law enforcement officers executed the search warrant, the detective conducted a second interview with Dann. During that conversation, Dann expressed interest in the seizure of the green truck. He told the detective that he had driven the truck and analysts probably would find his DNA inside. He adamantly denied, however, that the victim's DNA would be found inside the vehicle.

¶8        Subsequent testing of the various items seized pursuant to the search warrant revealed no physical evidence connected to the victim. Without physical evidence to substantiate the minor witness's account, the victim's murder case "went cold" for nearly two years.

¶9        Faced with no new leads, a detective and sergeant eventually decided to create a case file "filled . . . with different types of miscellaneous paperwork" and "present" that file to Dann with the suggestion that it contained DNA evidence implicating him in the murder. They hoped their "bluff" would elicit a "confession" from Dann.

¶10        During his third police interview, Dann admitted that he and Talavera bludgeoned the victim to death with a hammer. With a confession secured, the State charged Dann with one count of first-degree murder. The indictment outlined dual theories—felony murder (having kidnapped the victim, and "in the course of and furtherance of [that] offense," causing the

victim's death) and premeditated murder. The State also petitioned to revoke Dann's probation.

**¶11** At trial, the State called the minor witness to testify. Consistent with her initial police interview, the minor witness stated that she saw Dann wash off "a dark substance" that "looked like blood" a few weeks before law enforcement officers found the victim's body. However, she denied that Dann told her he had killed the victim. She also explained that since that night, she has been found mentally impaired by a court, diagnosed as "persistently acutely disabled" by medical professionals, and prescribed anti-psychotic medication to treat, among other things, hallucinations. She also admitted that around the time of the victim's death, she had been "self-medicating" with heroin, methamphetamine, and marijuana. The State also played an audio-recording of Dann's third police interview and admitted the audio-recording and a transcript of the third police interview as exhibits.

**¶12** After a three-day trial, a jury found Dann guilty as charged. The jury's verdict form reflects that only three jurors found Dann committed premeditated murder, but all twelve jurors found he committed felony murder.

**¶13** The superior court sentenced Dann to a term of life imprisonment, scheduled to commence upon his completion of concurrent sentences imposed in two, unrelated cases in which the court revoked his probation based on the underlying conviction. Dann timely appealed.

## DISCUSSION

### I.    Admission of Evidence of Inculpatory Statements

**¶14** Dann argues he should be granted a new trial because the superior court admitted into evidence his confession to law enforcement officers without first determining the voluntariness of his incriminating statements. He asserts law enforcement officers extracted his confession in violation of his constitutional rights, rendering those inculpatory statements inadmissible at trial.

**¶15** "To be admissible, a statement must be voluntary, not obtained by coercion or improper inducement." *State v. Ellison*, 213 Ariz. 116, 127, ¶ 30 (2006). "A defendant 'objecting to the admission of a confession' has a constitutional right grounded in the Fourteenth Amendment's Due Process Clause 'to a fair hearing in which both the underlying factual issues and the voluntariness of his confession are

actually and reliably determined.'" *State v. Bush*, 244 Ariz. 575, 588, ¶ 54 (2018) (quoting *Jackson v. Denno*, 378 U.S. 368, 380 (1964)). "But the United States Constitution 'does not require a voluntariness hearing absent some contemporaneous challenge to the use of the confession.'" *Id.* (quoting *Wainwright v. Sykes*, 433 U.S. 72, 86 (1977); *see also State v. Alvarado*, 121 Ariz. 485, 487 (1979) ("[A]bsent some objection by the defendant to the admission of his confession, the Constitution does not require a voluntariness hearing to be held."); *State v. Snee*, 244 Ariz. 37, 38-39, ¶¶ 6, 10 (App. 2018) (holding courts are neither constitutionally nor statutorily obligated to conduct voluntariness hearings unless "voluntariness is disputed by the defense").

**¶16** In this case, Dann did not move to suppress his incriminating statements, nor did he request a voluntariness hearing before the trial commenced. And when the State elicited information concerning his confession at trial, Dann did not object. Despite the absence of a formal objection, Dann nonetheless argues that he squarely challenged the voluntariness of his confession at trial. *See Bush*, 244 Ariz. at 589-90, ¶¶ 55, 57, 62 (noting that a defendant has no right to a "sua sponte voluntariness hearing" without an objection but discussing whether a clear challenge to a confession may serve as the "functional equivalent of an objection").

**¶17** We assume, without deciding, that Dann sufficiently challenged the admissibility of his incriminating statements at trial. *Cf. Bush*, 244 Ariz. at 589, ¶ 54 (noting that because the defendant "neither presented any evidence nor argued to the jury that his confession was involuntary," the superior court "was not required to hold a voluntariness hearing"). Accordingly, we must determine whether Dann was prejudiced by the superior court's failure to hold a voluntariness hearing. In assessing the voluntariness of Dann's confession, we consider the totality of the circumstances. *State v. Huerstel*, 206 Ariz. 93, 105, ¶ 50 (2003). We will not find Dann's statements involuntary unless there was "both coercive police behavior and a causal relation between the coercive behavior and the defendant's overborne will." *State v. Boggs*, 218 Ariz. 325, 336, ¶ 44 (2008).

**¶18** At the outset of the third interview, the detective read Dann the *Miranda*[2] warnings, and Dann stated that he understood his rights. The detective then told Dann that he had DNA test results from the minor witness's mother's house, Talavera's mother's house, and the green truck. Without revealing the purported DNA testing results, the sergeant interjected that the officers were talking to Dann "first" to "give [him] an

---

[2] *Miranda v. Arizona*, 384 U.S. 436 (1966).

opportunity" to explain "why" he did what they already "kn[e]w [he] did." In response, Dann admitted, "I was there."

¶19 At that point, the sergeant reiterated, "we're giving you the first opportunity because there's a difference between first degree murder, second degree murder and manslaughter, right?" The sergeant continued, "you have the first and only opportunity to be honest about what all happened . . . so we can go to the attorney and say, hey, [Dann] came clean, he's remorseful, he was honest and that gives us an opportunity to plead and try to help you out." Dann, again, said, "I was there."

¶20 Returning to the purported test results, the detective asked Dann to explain why law enforcement officers recovered his DNA if he was simply present and "didn't do it." In response, Dann recounted a confrontation with the victim in which he accused the victim of sexually abusing a minor. When Dann later told Talavera that the victim had denied the sexual abuse allegations, Talavera suggested that they "should do something about it."

¶21 Although claiming he "want[ed] no part" of Talavera's plan, Dann admitted that he was driving the green truck when he and Talavera offered the victim a ride. Dann explained that the victim accepted the offer and sat next to him in the front passenger seat. Talavera then moved directly behind the victim, wrapped a seat belt around his neck, and began choking him.

¶22 With the victim physically restrained, Dann drove to a remote area and parked. After ordering the victim to get out of the truck, Talavera began striking him with a hammer. Talavera's first blow hit the victim's arm. When Talavera subsequently struck the victim in the head, he fell to the ground. Initially, Dann told the detective and sergeant that only Talavera struck the victim and that he and Talavera drove away after the victim fell to the ground, appearing unconscious. Dann also confirmed the minor witness's account, in part, explaining that he and Talavera drove to her mother's house and washed their hands afterward.

¶23 After Dann finished relaying his initial account of the victim's murder, the sergeant cast doubt on his story, claiming that law enforcement officers had recovered his DNA from the seatbelt used to choke the victim. In response, Dann unequivocally denied sitting in the backseat and maintained that *he* drove the truck.

¶24 After reaffirming his account, Dann stated, "I just want to go home and [] see my kids." At that point, the sergeant pressed Dann, saying

"you're in a [expletive] hole" and "you're like six feet under." Reiterating that the officers were giving Dann "an opportunity"— a "rope" to climb out of his "hole"—and claiming that they had evidence he "swung that hammer," the sergeant warned Dann that "once [he and the detective] walk[ed] out th[e] door, it's done." Again, Dann simply stated that he wanted "to see [his] kids," and the sergeant responded, "[y]ou may not be able to now, depending on what you tell us. . . . I'm not saying you're never going to see your kids again but it's going to make a big difference when you see them. . . . Grab that [expletive] rope. . . . Don't [expletive] yourself because right now I can prove what you did." At that point, Dann revised his story and admitted that after Talavera attacked the victim, he struck the victim with the hammer four times—including striking the victim's mouth—and "finish[ing] it."

¶25        Dann does not contend that biographical or environmental factors induced his confession, and nothing in the record would support such an assertion. Dann was 24 years old at the time of the third interview and had prior experience with the criminal justice system. Although law enforcement officers escorted him to the interview, Dann was not handcuffed or otherwise physically restrained, and the interrogating officers were unarmed. Moreover, the interrogation lasted less than 40 minutes and it is uncontested that neither the detective nor the sergeant touched Dann or stood over him during questioning. *See State v. Ross*, 180 Ariz. 598, 603 (1994) ("The interrogation environment does not suggest police intimidation or coercion.").

¶26        Instead of asserting physical intimidation or duress, Dann contends that the interviewing officers used interrogation tactics amounting to psychological coercion. Specifically, he claims the detective and sergeant induced his confession through promises, threats, and fabricated evidence.

¶27        First, Dann argues that the interrogating officers extracted his confession with promises of leniency. "Promises of benefits or leniency, whether direct or implied, even if only slight in value, are impermissibly coercive." *State v. Lopez*, 174 Ariz. 131, 138 (1992). While broad in scope, this general principle does not preclude law enforcement officers from "offer[ing] to tell the prosecutor about the defendant's cooperation and suggest[ing] that such cooperation may increase the likelihood of a more lenient sentence" so long as the offer "is couched in terms of a mere possibility or an opinion." *Strayhand*, 184 Ariz. at 579 (quotation omitted); *see also State v. Tapia*, 159 Ariz. 284, 290 (1988) ("[U]nder some circumstances, direct promises that officers would tell the prosecutor if

defendant cooperated are permissible."). Likewise, "[m]ere advice from the police that it would be better for the accused to tell the truth when unaccompanied by either a threat or a promise does not render a subsequent confession involuntary." *State v. Amaya-Ruiz*, 166 Ariz. 152, 165 (1990); *see also State v. Blakely*, 204 Ariz. 429, 436, ¶ 29 (2003) ("Mere advice that it would be better to be truthful is a permissible interrogation tactic."); *Huerstel*, 206 Ariz. 93, 106, ¶ 55 (2003) ("[S]uch advice [to tell the truth] from the police when unaccompanied by either a threat or promise does not render a subsequent confession involuntary."(quotation omitted)).

¶28        Here, the interrogating officers' statements exhorting Dann to tell the truth did not constitute express or implied promises. Rather than assuring leniency, the officers simply offered to relay Dann's cooperation and remorse to the prosecutor. Although the sergeant, at one point, referenced possible charges, this statement was distinct from the offer to contact the prosecutor on Dann's behalf. *Tapia*, 159 Ariz. at 288-89 (explaining that interrogating officers may advise a defendant of the potential charges against him or the potential sentences that a court may impose should a jury convict the defendant of those charges). Having reviewed the interrogation in its entirety, neither the detective nor the sergeant offered Dann leniency in exchange for his incriminating statements. *See State v. Hensley*, 137 Ariz. 80, 87 (1983) (explaining a statement that "do[es] not offer any benefit to the defendant in exchange for information" is not an impermissible promise). Because none of the officers' statements constituted an impermissible promise, they did not render Dann's subsequent confession inadmissible. *Cf. Strayhand*, 184 Ariz. at 579 (holding detective's statement that the defendant's cooperation would impact "the amount of time" he received at sentencing constituted an impermissible promise that "caused the [d]efendant to confess").

¶29        Next, Dann contends that the law enforcement officers induced his inculpatory statements by threatening him. While Dann correctly notes that the sergeant, at times, used harsh and profane language, neither the sergeant nor the detective expressed any intent to harm Dann, threatened to tell the prosecutor if he failed to cooperate, or implied that he may receive a greater punishment if he refused to confess. *Cf. Tapia*, 159 Ariz. at 11 (holding officers' statements that they "would see to it that a defendant would go to prison if he failed to cooperate" constituted impermissible threats); *see also State v. Blakley*, 204 Ariz. 429, 436-37, ¶ 30 (2003) ("Although it is permissible for an interrogating officer to represent . . . that the defendant['s] cooperat[ion] will be communicated to the proper authorities, the same cannot be said of a representation that a defendant's failure to cooperate will be communicated to the prosecutor.") (quoting

*United States v. Tingle*, 658 F.2d 1332, 1336 n.5 (9th Cir. 1981)). Moreover, to the extent Dann contends that the interrogating officers induced his confession by suggesting he may be unable to see his children unless he cooperated, the record reflects that Dann, not the officers, raised the matter of his children. *Cf. Tingle*, 658 F.2d at 1336 (concluding police coerced confession by implying that defendant would not see her child for a long time unless she cooperated with police). Furthermore, by that point in the interview, Dann had already confessed to kidnapping the victim and being present for his murder (felony murder). *See Lopez*, 174 Ariz. at 138 (concluding that even if an officer made an implied promise during an interrogation, the defendant could not show that he relied on the promise because the defendant had already admitted to committing the crime when the "alleged inducement" was made). On this record, there is no evidence that the law enforcement officers used threats to coerce Dann's confession.

¶30        Finally, Dann argues that the interrogating officers fabricated incriminating evidence to secure his confession. "Standing alone, . . . a lie during interrogation does not render a confession involuntary." *Amaya-Ruiz*, 166 Ariz. at 165. In fact, "[a] statement induced by fraud or trickery is not made involuntary unless there is additional evidence indicating that the defendant's will was overborne or that the confession was false or unreliable." *State v. Winters*, 27 Ariz. App. 508, 511 (1976) (concluding the defendant's confession was voluntarily even though it was elicited after police officers falsely told the defendant that his fingerprints matched those found at the crime scene); *see also Strayhand*, 184 Ariz. at 579 (explaining "courts will tolerate some form of police gamesmanship so long as the games do not overcome a suspect's will and induce a confession not truly voluntary," and therefore "misrepresentations are not per se impermissible") (quotation omitted).

¶31        Although initially vague when they referenced the purported "DNA results," later in the interview, the interrogating officers unquestionably claimed to have physical evidence tying Dann to the victim's murder. In fact, at trial, the sergeant expressly acknowledged that he lied to Dann during the interrogation. But nothing in the record suggests that the interrogators' misleading statements and falsehoods coerced an involuntary confession. When confronted with false evidence that police officers had recovered his DNA from the passenger-side seatbelt, Dann adamantly denied even sitting in the backseat. In fact, he steadfastly maintained that Talavera, not he, choked the victim with a seatbelt. This unwavering denial shows that Dann's will was not overborne by the interrogating officers' use of false DNA evidence. *See Amaya-Ruiz*, 166 Ariz. at 160, 165 (determining defendant's confession to murder was voluntary,

even though a detective falsely told him an eyewitness had seen him running from a stolen truck, noting the defendant continued to deny that he had stolen the truck when confronted with the fabricated evidence, though he admitted that he committed murder). Because there is no evidence of physical coercion, impermissible promises, or threats in this case, there is no basis to conclude that the DNA deception, alone, induced an involuntary waiver of Dann's Fifth Amendment rights. *See Winters*, 27 Ariz. App. at 511. Equally important, nothing in the record suggests that Dann's confession was false or otherwise unreliable because of the deception. "The police are not forbidden to outsmart — they are forbidden to compel." *State v. Carrillo*, 156 Ariz. 125, 136 (1988).

**¶32**        Considering the totality of the circumstances, the record reflects that Dann's confession was voluntary and not the product of either physical or psychological coercion. He was not threatened, promised leniency, or otherwise induced to confess. On this record, the police did not overreach or otherwise overwhelm Dann's will. Therefore, the superior court properly admitted evidence of his confession, and Dann was not prejudiced by the lack of a voluntariness hearing.

## II.    Admission of Evidence of Probation Status

**¶33**        Dann contends he should be granted a new trial because the superior court admitted evidence that arguably implied he was on probation when he was taken into custody for his third police interview. He asserts this "other-act" evidence was both irrelevant and unfairly prejudicial.

**¶34**        We review evidentiary rulings for a clear and prejudicial abuse of discretion. *See State v. Ayala*, 178 Ariz. 385, 387 (App. 1994). In conducting our review, we defer to the superior court's assessment of relevance and unfair prejudice. *See State v. Via*, 146 Ariz. 108, 122 (1985) (noting that deference is appropriate because the superior court is best positioned to balance probative value and prejudice).

**¶35**        Before trial, defense counsel moved in limine to preclude the State from introducing any evidence regarding Dann's probation status. In his motion, defense counsel specifically noted that the third police interview "was conducted at the probation office with the assistance of" the probation department and argued that probation-related evidence should be excluded as both irrelevant and highly prejudicial.

**¶36**        On the first day of trial, the superior court discussed the motion in limine with the parties. The prosecutor agreed with defense

counsel that evidence regarding Dann's probation status was not "appropriate," stating he would "sanitize" any evidence before introducing it at trial. After hearing from the parties, the court granted Dann's motion in limine, precluding the prosecutor from eliciting or otherwise introducing any evidence that Dann "was on probation."

¶37        Despite the superior court's order and his own assurances, the prosecutor failed to sanitize both the audio-recording and the transcript of the third interview before presenting them to the jury during the interrogating sergeant's direct testimony. The unsanitized exhibits contained the following exchange:

> Sergeant: You got picked up by Probation?
>
> Dann: Yeah.

¶38        Immediately following the sergeant's direct testimony, and outside the jury's presence, defense counsel objected to the transcript's inclusion of the sergeant's statement concerning probation. The superior court agreed with defense counsel that the prosecutor should have redacted the transcript and offered to instruct the jury not to consider that portion of the interview. Defense counsel declined the court's offer of a curative instruction, explaining he did not want the court to emphasize the point unnecessarily. Defense counsel also noted that the sergeant did not say that Dann was "on probation," but that "he was picked up by Probation."

¶39        Drawing on that distinction, the superior court characterized the exchange as "nonsensical" and ordered that it be redacted from the transcript before submitting the exhibit to the jury for deliberation. At that point, defense counsel requested that the audio-recording be "stricken from the record" because it also "violated" the superior court's in limine ruling. The court denied defense counsel's request, again noting that the sergeant's statement simply referred to Dann having been "picked up by Probation" rather than being "on probation." However, the court also ordered the prosecutor to redact the audio recording before submitting that exhibit to the jury for deliberation.

¶40        Relevant evidence is admissible unless it is otherwise precluded by the federal or state constitution, an applicable statute, or rule. Ariz. R. Evid. 402. Evidence is relevant if "it has any tendency" to make a fact of consequence in determining the action "more or less probable than it would be without the evidence." Ariz. R. Evid. 401. Nonetheless, even relevant evidence may be excluded "if its probative value is substantially outweighed by a danger of . . . unfair prejudice." Ariz. R. Evid. 403.

Moreover, "evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person." Ariz. R. Evid. 404(b)(1).

**¶41** The sergeant's reference to probation officers taking Dann into custody was inadmissible. Although nothing in the record suggests that the State presented the fleeting statement intentionally, much less for the impermissible purpose of proving Dann's character, it was nonetheless irrelevant—meaning it did not have any tendency to make a fact of consequence in determining Dann's guilt or innocence more or less probable.

**¶42** But the superior court did not find the evidence admissible. To the contrary, the court found that the State's introduction of the evidence violated its in limine ruling. The narrow question before us, then, is whether the superior court abused its discretion in fashioning a remedy for the violation. When the superior court offered to admonish the jury not to consider the sergeant's statement, defense counsel refused a curative instruction. Following defense counsel's rejection of a curative instruction, the court ordered the prosecutor to redact both the audio-recording and the transcript before submitting them to the jury for deliberation. While defense counsel petitioned the court to strike the audio-recording from the record, in its entirety, the isolated and somewhat vague reference to probation did not warrant such a dramatic measure. *See State v. Laird*, 186 Ariz. 203, 206-07 (1996) (concluding unsolicited statements referring to the defendant's probation and detention status were such "a brief and tiny part of extensive trial testimony" that the superior court's remedy of striking the answers and instructing the jury to disregard them was "adequate"); *see also State v. Bailey*, 160 Ariz. 277, 280 (1989) (determining the codefendant's "rambling answer suggest[ing] that [the] defendant had served time in prison" was inadmissible but "fairly innocuous," given its vague nature, and therefore did not warrant a mistrial). On this record, the superior court did not abuse its discretion by offering a curative instruction and ordering the State to redact the exhibits instead of striking evidence of the third interrogation in its entirety.

### III. Denial of Motion to Change Counsel

**¶43** Dann contends the superior court violated his constitutional right to counsel by denying his motion for change of counsel. He asserts that he and his appointed attorney had "a complete breakdown in the attorney-client relationship."

¶44  "The Sixth Amendment guarantees criminal defendants the right to representation by counsel, but an indigent defendant is not entitled to counsel of choice, or to a meaningful relationship with his or her attorney." *State v. Gomez*, 231 Ariz. 219, 224, ¶ 19 (2012) (quotation omitted). A defendant's constitutional right to competent counsel "is violated when there is a complete breakdown in communication or an irreconcilable conflict between a defendant and his appointed counsel." *Id.* (quotation omitted). We review a superior court's denial of a request for new counsel for an abuse of discretion. *Id.* at ¶ 18.

¶45  Approximately nine months before trial, Dann transmitted two requests for new counsel to the superior court, citing both a lack of confidence in his attorney and a lack of communication. The court scheduled a hearing on the matter, but by the day of the hearing, Dann withdrew both requests, stating he and counsel "ha[d] talked" and "come to an understanding and agreement." Accordingly, the court "t[ook] no further action" regarding the matter.

¶46  Five months later, Dann transmitted another request for new counsel to the superior court, asserting that he and counsel had "develop[ed]" a "conflict of interest" and that counsel was "ineffective." The court again scheduled a hearing.

¶47  At the hearing, Dann provided a somewhat convoluted explanation for his request for new counsel, stating:

> Due to the unnecessary complications of trying to paper trail the (unintelligible) proving consistent inconsistencies that my lawyer develops with me creating conflict. (Unintelligible) my court appointed attorney delivers indicates my initial complaint of ineffective assistance of counsel. The minimal contact (unintelligible) initiate any time of rapport with said counsel deems impossible.

Dann then complained, more clearly, that defense counsel failed to answer both his collect calls and his family members' phone calls, and that counsel "rarely" responded to emails.

¶48  After hearing from Dann, the superior court invited defense counsel to respond. Defense counsel simply noted that he had not yet commenced pretrial interviews, "so if the Court was inclined to get [Dann] a new attorney," the transition would not be difficult.

¶49 At that point, the superior court explained that due to the pandemic there "ha[d] been issues," such as increased restrictions at jails and quarantining at the legal defender's office, which had hindered attorney-client communications in numerous criminal cases. While acknowledging that Dann had not received the level of communication and engagement with counsel that he desired, the court found defense counsel and Dann had "at least some discussions regarding plea negotiations" and that Dann had not asserted, much less shown, "a complete lack of communication" or any other basis to find an "irreconcilable conflict." Noting defense counsel's considerable experience in handling murder cases and "difficult clients," the court denied Dann's request for a new attorney "at th[at] point in time," stating the court had not yet "heard enough" to justify the appointment of new counsel.

¶50 When a defendant requests substitution of counsel, the superior court must inquire regarding the basis for the request. *State v. Torres*, 208 Ariz. 340, 343, ¶ 7 (2004). While a formal hearing may not be necessary to address "generalized complaints about differences in strategy," a court "must conduct a hearing" when a defendant makes "sufficiently specific, factually based allegations" supporting a request for new counsel. *Id.* at ¶ 8 (quotation omitted).

¶51 "At such a hearing, the defendant bears the burden of demonstrating that he has a genuine irreconcilable conflict with his counsel or that there has been a total breakdown in communications." *Id.* "[T]o prove a total breakdown in communication, a defendant must put forth evidence of a severe and pervasive conflict with his attorney or evidence that he had such minimal contact with the attorney that meaningful communication was not possible." *State v. Paris-Sheldon*, 214 Ariz. 500, 505, ¶ 12 (App. 2007) (quotation omitted). "If a defendant establishes a total breakdown in communication, or an irreconcilable conflict with his attorney, then the [court] must grant the request for new counsel." *Torres*, 208 Ariz. at 343, ¶ 8.

¶52 "Before ruling on a motion for change of counsel," the superior court should consider whether an irreconcilable conflict exists, whether new counsel would face the same conflict, the timing of the motion, the inconvenience to witnesses, the time period already elapsed between the alleged offense and trial, the defendant's proclivity to change counsel, and the quality of counsel. *Gomez*, 231 Ariz. at 225, ¶ 25.

¶53 Applying these principles here, neither Dann's written requests nor his oral hearing statements alleged sufficient facts to warrant

a change in counsel. *Cf. State v. Moody*, 192 Ariz. 505, 507, ¶ 13 (1998) (noting the record was "replete with examples of a deep and irreconcilable conflict" between the defendant and his appointed attorney). Simply put, Dann never cited any facts demonstrating discord or hostility to substantiate his bare allegations of an irreconcilable conflict with appointed counsel. Although Dann asserted that he and counsel had a total breakdown in communication, the superior court noted that they *had* discussed plea negotiations, undermining Dann's claim that meaningful communication was not possible. Moreover, the court explained that numerous defendants with pending cases likewise complained of unsatisfactory communication with their appointed attorneys, primarily due to pandemic-related restrictions and circumstances. Apart from noting that strained communication between defendants and counsel was a common pandemic-era complaint and not, alone, indicative of a total breakdown in communication or an irreconcilable conflict, the court also pointed to counsel's experience and ability to handle both challenging cases and clients as a basis to deny Dann's request.

**¶54**      Citing the other relevant factors, Dann correctly notes that nothing in the record suggests that a change in counsel would have materially inconvenienced either trial witnesses or the court. And, apart from his previous request for new counsel, which he later withdrew, the record does not reflect that Dann had a "proclivity" to change counsel. While these factors do not weigh against a change in counsel, they do not mandate a change in counsel when a defendant has failed to allege specific facts demonstrating a severe and pervasive conflict with his attorney or the near absence of contact such that meaningful communication with appointed counsel was impossible. On this record, we cannot say that the superior court, having provided Dann with an opportunity to present specific, factual allegations, abused its discretion by denying his motion for new counsel. *See Paris-Sheldon*, 214 Ariz. at 505, ¶ 13 (explaining a superior court must resolve any factual dispute that arises during a *Torres* inquiry, and a reviewing court defers "to that resolution so long as the record supports it").

## CONCLUSION

¶55        For the foregoing reasons, we affirm.



AMY M. WOOD • Clerk of the Court
FILED: AA